**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| AMERICAN SENIOR COMMUNITIES, L.L.C., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| JAMES BURKHART, ) | |
| DANIEL BENSON, ) | |
| ROGER WERNER, ) | |
| STEVEN GANOTE, ) | |
| JOSHUA BURKHART, ) | |
| ACCD LLC (d/b/a CRUSADER HEALTHCARE ) | |
| SERVICES III), ) | |
| AMERICAN SENIOR CARE LLC, ) | Case No.: 1:17-cv-3273 |
| BRIGHT HVAC LLC, ) | |
| BTS SOLUTIONS LLC, ) | |
| BTS VENTURES LLC (d/b/a BEST CHOICE), ) | |
| CARDINAL DISTRIBUTION LLC ) | |
| CIRCLE CONSULTING LLC, ) | **DEMAND FOR JURY TRIAL** |
| FINITE CAPITAL LLC (d/b/a HEALTHCARE ) | |
| BY DESIGN), ) | |
| FORCE HOLDING COMPANY LLC, ) | |
| HEARTLAND FLAG LLC, ) | |
| INDIANA UNIFORM COMPANY LLC, ) | |
| JACCD LLC (d/b/a CRUSADER IV), ) | |
| MED-HEALTHLINE SUPPLY LLC, ) | |
| OREGON PROPERTIES LLC, ) | |
| 105214 INVESTMENTS LLC (d/b/a ) | |
| CRUSADER HEALTHCARE SERVICES), ) | |
| 105210 INVESTMENTS LLC (d/b/a ) | |
| CRUSADER HEALTHCARE SERVICES II), ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

1.  From approximately 2008 through at least September 15, 2015, Defendants systematically looted American Senior Communities, L.L.C. ("ASC" or "the Company") through a pattern of racketeering activity. During this time period, ASC was focused on its mission: to

care for some of society's most vulnerable persons, the sick and the elderly.  Defendants exploited ASC's singular focus on providing first-class care to its patients to defraud the Company out of tens of millions of dollars.

2.      James Burkhart ("Burkhart") and Daniel Benson were the highest-ranking executives at ASC.  Burkhart was the Chief Executive Officer ("CEO"), and Benson was the Chief Operating Officer ("COO").  They used their positions of trust to limit the number of people who had access to the financial details of their operation.  They enlisted their associates to assist them in constructing a racketeering enterprise (the "Burkhart/Benson Enterprise") and executing a series of mail and wire frauds and other racketeering activities that fell into one or more of the following categories:

a.      Frauds that required ASC to pay inflated prices for products and services to companies secretly owned and/or controlled by the Burkhart/Benson Enterprise and to companies that remitted kickbacks to the Burkhart/Benson Enterprise;

b.      Frauds that required ASC to pay unnecessary fees pursuant to a sham contract to a company owned and/or controlled by the Burkhart/Benson Enterprise in return for little or no benefit;

c.      Frauds that caused ASC to pay inflated salaries and bonuses to Burkhart, Benson, and Roger Werner, the Company's Chief Financial Officer ("CFO");

d.      Frauds that enabled the Burkhart/Benson Enterprise to obtain lavish benefits, including skyboxes for sporting events, private jets, golf trips, and expensive meals for themselves and their associates at the expense of ASC;

e.      Fraudulent misdirection of ASC's corporate opportunities for the benefit of the Burkhart/Benson Enterprise; and

2

f. Defendants also engaged in a variety of activities designed to conceal this series of frauds.

## THE PARTIES

### Plaintiff

3. ASC is a privately-owned Indiana company headquartered in Indianapolis, Indiana. ASC owns, operates, and/or manages a variety of extended care facilities, including assisted and independent senior living communities, nursing homes, and skilled-living facilities throughout Indiana. Neither Burkhart nor any of the "Executive Defendants" (defined below) ever had an ownership interest in ASC. The Health and Hospital Corporation of Marion County ("HHC") holds the health care operating licenses for most of the facilities that ASC manages, and as a result, bears the sole financial and regulatory responsibilities for each facility (hereinafter referred to as "the Facility" or "the Facilities").

### Executive Defendants

4. Burkhart is an Indiana resident and ASC's former CEO, who operated ASC from approximately 2000 through September 15, 2015, when the Federal Bureau of Investigation (FBI) executed search warrants at numerous sites, including Burkhart's principal residence and his primary office at ASC. At all times when he was the CEO of ASC, Burkhart owed a fiduciary duty to ASC to devote all of his professional efforts to the benefit of the Company, not engage in activities that would put him in a conflict with ASC, and not usurp any of ASC's corporate opportunities for himself. Unbeknownst to ASC's owners, Burkhart owned in whole or part certain companies to which Burkhart and Benson directed ASC's business, including Bright HVAC LLC, Finite Capital LLC, Med-Healthline Supply LLC, and Oregon Properties.

5. Benson is an Indiana resident and ASC's former COO who worked closely with Burkhart throughout his tenure. At all times when he was the COO of ASC, Benson owed a

fiduciary duty to ASC to devote all of his professional efforts to the benefit of the company, not engage in activities that would put him in a conflict with ASC, and not usurp any corporate opportunities for himself. Unbeknownst to ASC's owners, Benson owned in whole or part certain companies to which Burkhart and Benson directed ASC's business, including Finite Capital LLC.

6.     Roger Werner is an Indiana resident and ASC's former CFO who worked closely with both Burkhart and Benson beginning in 2002. Werner became ASC's CFO in 2007. At all times when he was CFO of ASC, Werner owed a fiduciary duty to ASC to devote all of his professional efforts to the benefit of the company, not engage in activities that would put him in a conflict with ASC, and not usurp any of ASC's corporate opportunities for himself.

**<u>Vendor Defendants</u>**

7.     Steven Ganote is an Indiana resident who owned, in whole or in part, various businesses that purportedly provided services or products to ASC, including Bright HVAC LLC, BTS Ventures LLC (d/b/a Best Choice), BTS Solutions LLC, Force Holding Company, LLC, Finite Capital LLC (d/b/a Healthcare by Design), Indiana Uniform Company LLC, Med-Healthline Supply LLC, and Oregon Properties LLC.

8.     Joshua Burkhart ("Josh Burkhart") is an Indiana resident and was the owner of Circle Consulting LLC and Heartland Flag LLC. He is Burkhart's brother. During all relevant times, Josh Burkhart also was employed by a certified public accounting firm called Bradley and Associates. Bradley and Associates provided accounting services to ASC and HHC, and Josh Burkhart worked on these accounts while employed at Bradley and Associates.

9.     ACCD LLC d/b/a Crusader Healthcare Services III is an Indiana company that was owned by Burkhart for the purpose of holding a put option related to the Ben Hur Facility.

10.    American Senior Care LLC is an Indiana company owned by Burkhart. It is a shell company that purportedly provided consulting services.

11.     Bright HVAC LLC is an Indiana Company owned in party by Ganote and Burkhart. It is a shell company that purportedly provided heating, ventilating and air conditioning ("HVAC") services.

12.     BTS Solutions LLC is an Indiana company that is owned by Ganote.  It is a shell company that purportedly provided speech therapy consulting services.

13.     BTS Ventures LLC (d/b/a Best Choice) is an Indiana company that is owned and/or operated by Ganote.  It is a shell company that purportedly provided speech therapy services.

14.     Cardinal Distribution LLC is an Indiana company that is owned by Force Holding Company.  It is a shell company that purportedly sold personal and wound care products.

15.     Circle Consulting LLC is an Indiana company owned by Josh Burkhart.  It is a shell company that purportedly provided consulting services.

16.     Finite Capital LLC (d/b/a Healthcare by Design) is an Indiana company owned in part by Benson, Burkhart, and Ganote.  It is a shell company that purportedly provided services related to patient lifts and scent machines, among other services.

17.     Force Holding Company LLC is an Indiana company owned by Ganote.  It is a shell company that represented itself at times to be a group purchasing organization and a broker.

18.     Heartland Flag LLC is an Indiana company owned by Josh Burkhart.  It is a shell company that purportedly sold flags.

19.     Indiana Uniform Company LLC is an Indiana company owned in part by Burkhart and Ganote.  It is a shell company that purportedly sold uniforms, door wraps, luggage, and other merchandise.

20.     JACCD LLC d/b/a Crusader IV is an Indiana company owned by Burkhart for the purpose of holding put options related to Facilities owned by Formation Capital and purportedly provided consulting services to Formation Capital.

21.     Med-Healthline Supply LLC is an Indiana company owned in part by Burkhart and Ganote.  It is a shell company that purportedly sold disposable medical supplies and equipment.

22.     Oregon Properties LLC is an Indiana company owned by Burkhart and Ganote that was purportedly in the business of leasing Indiana property.

23.     105214 Investments LLC d/b/a Crusader Healthcare Services is an Indiana company owned in part by Burkhart for the purpose of holding put options related to Facilities owned by Omega Healthcare Investors.

24.     105210 Investments LLC d/b/a Crusader Healthcare Services II is an Indiana company owned by Burkhart for the purpose of holding put options related to Facilities owned by Eric Rothner.[1]

## JURISDICTION AND VENUE

25.     ASC has brought claims against Defendants alleging violations of the Racketeer Influence and Corrupt Organizations Act ("RICO").  The Court has subject matter jurisdiction over ASC's RICO claims asserted in this Complaint pursuant to 28 U.S.C. § 1331.

26.     The Court has supplemental jurisdiction over ASC's claims arising out of the laws of Indiana pursuant to 28 U.S.C. § 1367(a) because these claims are so related to ASC's claims under federal law that they form part of the same case or controversy and derive from a common nucleus of operative fact.

---

[1] For purposes of this Complaint, ACCD LLC, JACCD LLC, 105214 Investments LLC, and 105210 Investments LLC collectively will be referred to as "the Crusader entities."

27.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because (1) some of the Defendants reside in the Southern District of Indiana and all of the Defendants reside in the state of Indiana, and (2) a substantial part of the events or omissions giving rise to the claim occurred in the Southern District in Indiana.

## BACKGROUND

### ASC's Relationship with HHC

28.     ASC and HHC entered into agreements to provide nursing home services to Indiana seniors from 2003 to the present.  HHC is a municipal corporation that operates and holds licenses to operate nursing homes and assisted living Facilities throughout Indiana.  HHC has executed management agreements with ASC whereby ASC manages the Facilities for HHC in exchange for management fees.  ASC's obligations under the management agreements include staffing the nursing homes, maintaining the Facilities, arranging for the therapeutic and medical care of residents, planning and providing meals to residents, making admission decisions for residents, selecting vendors, paying the vendor invoices, managing and accounting for certain HHC funds, and recording all other financial transactions associated with the costs of providing care at the Facilities.

29.     The physical property and real estate that ASC manages for HHC, while licensed to and operated by HHC, are owned by other entities, which lease the Facilities to HHC.

30.     The agreement between ASC and HHC to provide nursing home services to Indiana residents started in or about January 2003.  At that time, ASC managed 12 nursing home Facilities that were licensed to and operated by HHC. The number of Facilities that ASC managed for HHC grew over time as HHC acquired the operations of additional Facilities.  Currently, ASC manages 78 skilled nursing homes, four assisted living facilities, and numerous independent housing units on behalf of HHC.  ASC and affiliates employ over 10,000 employees at any given time in

providing the care to residents and management of the Facilities.  ASC cares for over 9,000 residents.

31.     Burkhart played a significant role in deal negotiations related to HHC acquiring the operations of additional Facilities.  Burkhart often brought deal opportunities to the attention of ASC and HHC.  Some of these deals involved HHC acquiring the operations of Facilities from existing operators, including ASC's owners at times, with no change in the ownership of the real estate.  Other deals involved HHC acquiring the operations of Facilities and/or executing new leases after the sale of the Facilities' real estate to new owners/lessors.  As the number of Facilities HHC operated expanded, new management agreements between ASC and HHC were negotiated and executed.

**ASC's Organization**

32.     For over a decade, Burkhart was ASC's CEO.  During most of Burkhart's tenure as CEO, Benson was ASC's COO and Werner was the CFO.

33.     ASC had a six-member Board of Managers.  The Executive Defendants were never on ASC's Board of Managers, and they did not possess any ownership interest in ASC.

34.     During Burkhart's tenure as CEO, he typically met with the Board of Managers biweekly and provided general updates about the business, including plans for opening additional Facilities.  Burkhart also met on a monthly basis with members of ASC's ownership group at Managers meetings.  During these meetings, Burkhart provided the ownership group with high-level financial and budget information about ASC. Throughout these meetings, Burkhart did not reveal that he and Benson were receiving kickbacks or were otherwise profiting from their affiliation with ASC beyond their approved compensation.  Similarly, he did not reveal that his and Benson's associates, friends and family members were benefitting from the Executive Defendants' fraudulent actions.

35. The Board of Managers did not approve vendors for hire or review any vendor-related information. Rather, Burkhart and Benson centralized the day-to-day management of the Facilities and were responsible for selecting vendors that provided products and services to each Facility. Burkhart and Benson allowed very few people access to ASC's detailed "home-office" or headquarters' financial information. Burkhart also directed certain vendors to send invoices directly to him rather than ASC's home office

36. Werner was one of the few people who had full access to ASC's financial information. He played a central role in enabling the Burkhart/Benson Enterprise to conceal its fraudulent activities in return for grossly inflated bonuses that were not approved by ASC's owners and a 10% commission on gold bars that he purchased for Burkhart. For example, Werner directed ASC employees to pay questionable vendor invoices provided to him by Burkhart, allocated expenses to the Facilities as directed by Burkhart without knowing the purpose of the payments, used improper accounting practices to hide inflated and unnecessary vendor payments and excessive and unapproved bonuses for the Executive Defendants, improperly debited the bonus payments for the Executive Defendants from a secret account and ultimately paid the account back from the ASC owners' management fees without their knowledge or consent, made double and inflated payments for property ASC was renting at Burkhart's direction, provided Burkhart with checks to hand deliver to certain vendors who were overcharging for their services, and obtained multiple $1,000 gift cards for Burkhart without question.

**<ins>Duties Owed by the Executive Defendants to ASC</ins>**

37. Throughout the relevant time, each of the Executive Defendants had contracts setting forth their contractual and fiduciary obligations to ASC. Benson and Werner each had contractual duties to "devote substantially all [their] business time, attention, and energies to the business of [ASC]." Their agreements further provided that "during the employment period, [they

9

would] not engage in any other business activity regardless of whether such activity [wa]s pursued for profit, gain, or other pecuniary advantage."  Burkhart's agreement required him to "devote [his] best efforts and be fully committed to the success of ASC and its affiliates."

38.     The Executive Defendants' repeated solicitation, acceptance, and facilitation of kickbacks at ASC's expense, their creation of shell companies used to defraud ASC, as well as the time they spent engaged in running and concealing these fraudulent schemes when they were supposed to be working for ASC, were clear violations of their employment agreements.

39.     The Executive Defendants' employment agreements also set forth limitations on entertainment expenditures, which the Executive Defendants violated.  Burkhart's employment agreement stated that he was entitled to be reimbursed for "all business expenses personally incurred by you in the ordinary course of your employment."  Benson's and Werner's agreements stated that they would be reimbursed for "all reasonable expenses incurred by the Executive in performing services hereunder … in the service of the Company, provided that such expenses [we]re incurred and accounted for in accordance with the policies and procedures established by the Company...."  As set forth in detail below, the Executive Defendants repeatedly violated these agreements by causing ASC to pay for lavish gifts, gift cards, and entertainment that were solely for the benefit of themselves and their co-conspirators, not ASC, and by taking intentional steps to conceal these purchases from the Company's owners.

40.     The Executive Defendants' actions were also prohibited conflicts of interest as set forth in ASC's home office Employee Handbook.  The Handbook included but was not limited to the following prohibitions:

- "An employee and his/her immediate family may not own or hold any significant interest in a supplier…"

- "Employees are required to obtain written approval from their supervisor before participating in outside employment. . . In general, outside work

activities are not allowed when they prevent the employee from fully performing work for which he or she is employed at the Company…[or] involve organizations that are doing or seek to do business with the Company, including actual or potential vendors or customers, or violate provisions of the law or the Company's policies or rules."

- "Employees are hired and continue in ASC's employment with the understanding that ASC is their primary employer and that other employment or commercial involvement that is in conflict with the business interests of ASC is strictly prohibited."

- "An employee must promptly disclose actual or potential conflicts of interest, in writing, to his or her supervisor.  Approval will not be given unless the relationship will not interfere with the employee's duties or will not damage the Company's relationship."

41.     The Executive Defendants violated all of these provisions.  Burkhart and Benson secretly held ownership interests in shell vendors with which ASC did business at their direction and accepted kickbacks, either directly or indirectly, from other vendors.  Werner failed to disclose that certain vendor entities were owned by Burkhart's brother, Josh Burkhart, but continued to direct payments to these entities at Burkhart's direction.  The Executive Defendants also spent substantial amounts of time on their fraudulent schemes instead of working to further ASC's interests.  Additionally, they actively hid their kickbacks and ownership interests in the shell vendors by limiting ASC employees' access to vendor invoices, making false statements about HHC's vendor requirements, engaging in improper accounting practices and over-compensating themselves.

42.     In addition to these express contractual terms, there also was an implied duty of fair dealing written into each of the Executive Defendants' employment agreements.  As executives of the Company, the Executive Defendants had the legal duty to exercise good faith and fair dealing in the performance and enforcement of their contracts.  Each of the Executive Defendants violated this duty by carrying out the conduct described throughout this Complaint.

## THE RACKETEERING ENTERPRISE

43.     From approximately 2008, through at least September 15, 2015, the Executive Defendants and Vendor Defendants comprised an association-in-fact enterprise, which is referred to throughout this Complaint as the "Burkhart/Benson Enterprise."

44.     Each of the Defendants knowingly associated with the Burkhart/Benson Enterprise during the time period relevant to this Complaint.

45.     Burkhart led and directed the affairs of the Burkhart/Benson Enterprise.  Benson served as Burkhart's deputy and directed, assisted, coordinated, and facilitated the Burkhart/Benson Enterprise through his role as COO of ASC.  Werner handled the finances of the Burkhart/Benson Enterprise, taking orders directly from Burkhart and directing the enterprise to undertake financial transactions at the expense of ASC.

46.     Ganote and each of the other Vendor Defendants formed third-party businesses or corrupted legitimate businesses in order to receive proceeds of the racketeering activities of the Burkhart/Benson Enterprise.  Ganote and the other Vendor Defendants performed critical functions for the Burkhart/Benson Enterprise as their corrupt business organizations received inflated payments or sham consulting fees.  The Vendor Defendants routinely distributed some of these illicitly obtained funds to other members of the Burkhart/Benson Enterprise.

47.     The Burkhart/Benson Enterprise constituted an ongoing organization, and the structure described above remained intact throughout the existence of the Burkhart/Benson Enterprise and functioned as a continuing unit with a common purpose of achieving the agreed-upon objectives of the Burkhart/Benson Enterprise.  Each of the Defendants participated in the Burkhart/Benson Enterprise through the pattern of racketeering activity described below.

48.     The activities of the Burkhart/Benson Enterprise affected interstate commerce and consisted of hundreds, if not thousands, of instances of mail and wire fraud.

**Purposes of the Enterprise**

49.     The purposes of the Burkhart/Benson Enterprise included, but were not limited to, the following:

        a.     Enriching the leaders (Executive Defendants), members (Vendor Defendants), and associates of the Burkhart/Benson Enterprise through kickbacks and artificially inflated invoices issued to ASC for products and services;

        b.     Enriching the leaders (Executive Defendants), members (Vendor Defendants), and associates of the Burkhart/Benson Enterprise through a sham consulting contract;

        c.     Enriching the leaders (Executive Defendants) of the Burkhart/Benson Enterprise through excessive and unapproved bonuses that were concealed from ASC's owners via fraudulent accounting practices;

        d.     Enriching the leaders (Executive Defendants), members (Vendor Defendants), and associates of the Burkhart/Benson Enterprise through reimbursements for unapproved and excessive personal expenditures;

        e.     Enriching the leaders (Executive Defendants), members (Vendor Defendants), and associates of the Burkhart/Benson Enterprise through fraudulent misdirection of ASC's corporate opportunities via false statements and material omissions;

        f.     Enriching the leaders (Executive Defendants), members (Vendor Defendants), and associates of the Burkhart/Benson Enterprise through the concealment of unlawful conduct from ASC;

        g.     Promoting and enhancing the Burkhart/Benson Enterprise and the activities and business interests of the Defendants;

h.     Preserving and protecting the power, operations, proceeds, and associated business entities of the Burkhart/Benson Enterprise through the use of illegitimate accounting practices, employee intimidation and isolation; and the restriction of information from ASC's owners and employees; and

i.     Taking steps designed to prevent the detection of the Burkhart/Benson Enterprise's activities by the owners or employees of ASC and from law enforcement.

**Association with and Conduct of the Enterprise**

50.     In approximately 2007, the Executive Defendants began constructing and managing a series of six categories of fraudulent schemes aimed at defrauding ASC in a variety of ways.  They perpetuated these schemes to defraud ASC continually until the FBI raided ASC's offices and the homes of several Defendants in September 2015.  These six schemes necessarily involved coordinating, directing, and conspiring with the Vendor Defendants to facilitate the unlawful operation of the Burkhart/Benson Enterprise.

51.     These six categories of schemes consisted of the illicit receipt of: (1) funds from inflated vendor charges; (2) funds from a sham contract; (3) excessive and unapproved bonuses; (4) reimbursement of inappropriate personal expenditures; (5) funds from real estate deals and a joint venture in China; and (6) the concealment of unlawful conduct from ASC.

**I.     PAYMENTS AND KICKBACKS FROM INFLATED VENDOR INVOICES**

52.     The Executive Defendants routinely directed ASC employees to procure products and services from (1) vendors who paid the Executive Defendants and their associates kickbacks that were wrapped into the prices charged to ASC and (2) shell companies owned and/or controlled by the Burkhart/Benson Enterprise, including the Vendor Defendants, which merely obtained the products and services from other providers and then, at the direction of Burkhart and Benson, sent inflated invoices to ASC, knowingly overcharging ASC for the services.  Upon receiving inflated

payments from ASC, the Vendor Defendants remitted at least a portion of the inflated amounts back to Burkhart, Benson and other members of the Burkhart/Benson Enterprise.

53.     The Executive Defendants and Vendor Defendants, on numerous occasions between 2008 and September 2015, caused inflated invoices to be sent to ASC via United States Mail, and ASC typically paid the invoices via mailed checks or wire transactions from ASC's account.

54.     Defendants created companies to receive, process, and hold their ill-gotten gains, including kickbacks.

55.     The schemes in which certain Defendants received kickbacks and other forms of payment from overcharges included the following:

### A.     **<u>Bright HVAC</u>**

56.     <u>Summary of Fraudulent Scheme:</u> Bright HVAC is a shell company created by the Burkhart/Benson Enterprise to issue false invoices to ASC overcharging the Company for HVAC services and then remit the inflated amount to Burkhart, Benson, Ganote and others associated with the Burkhart/Benson Enterprise.

57.     In August 2015, at Burkhart's direction, ASC entered into a Services Agreement with Bright HVAC, pursuant to which Bright HVAC would perform various HVAC services for ASC, including a spring cooling check of all air conditioning units, a fall heating check of all heating units, a coil cleaning, and three filter changes per year.  In return, ASC agreed to pay Bright HVAC approximately $710,000 three times per year, a substantially inflated price.

58.     Burkhart and Benson directed ASC employees to use Bright HVAC for its HVAC maintenance despite ASC employees' reports that Bright HVAC charged exorbitant prices.

59.     Although the agreement was between ASC and Bright HVAC, all work performed under the Services Agreement was performed by employees of Company A, an actual HVAC

company.  Company A originally proposed providing the same annual services to ASC for approximately $475,000 less than Bright HVAC charged.

60.    Instead of hiring Company A directly, the Burkhart/Benson Enterprise created Bright HVAC, a company with a name deceptively similar to Company A's name, to enter into a fraudulent contract with ASC for the provision of these services at an artificially inflated price. Bright HVAC merely paid Company A for its work and kept the inflated portion of the charges.

61.    On the day the Services Agreement was executed, at the direction of the Burkhart/Benson Enterprise, Bright HVAC sent a fraudulently inflated invoice to ASC for the first installment of $710,078, and ASC paid Bright HVAC the same week.  Bright HVAC then kept the inflated portion of the first installment.

62.    Bright HVAC added no value to the HVAC services provided to ASC and was merely used as a means to provide kickbacks to the Burkhart/Benson Enterprise.

63.    As a result of this scheme, Burkhart, Benson, Ganote, Bright HVAC and others were fraudulently enriched.

### PREDICATE ACTS ASSOCIATED WITH SCHEME 1: BRIGHT HVAC

64.    In relation to the scheme described in paragraphs 56-63 above, Burkhart, Benson, Ganote, Bright HVAC, and others committed the following acts of racketeering, any one of which constitutes a predicate act associated with Scheme 1:

### PREDICATE ACT 1

a.    On or about August 1, 2015, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, in accordance with the directions thereon, an envelope containing a fraudulently inflated invoice from Bright HVAC to ASC in the amount of $710,078 in violation of United States Code, Title 18, Section 1341.

**PREDICATE ACT 2**

b.      On or about August 7, 2015, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check to Bright HVAC in the amount of $710,078 in violation of United States Code, Title 18, Section 1341.

**B.      BTS Venture LLC (d/b/a Best Choice) and BTS Solutions LLC**

65.      <u>Summary of Fraudulent Scheme:</u> Best Choice was a speech therapy company operated by Ganote.  During the spring of 2013, Burkhart and Benson directed ASC employees to remove the speech therapists from ASC's affiliate's payroll, transfer them to Best Choice's payroll, and pay Best Choice an hourly rate for their services at twice the rate it paid to employ the speech therapists itself.  Best Choice issued fraudulently inflated invoices to ASC, and the inflated portions of the payments were then kicked back to Burkhart, Benson, Ganote, and other members of the Burkhart/Benson Enterprise.  A year later, Burkhart and Benson directed ASC to pay BTS Solutions, a shell company owned by Ganote, a sham consulting fee for purportedly helping ASC move the speech therapists back to ASC's affiliate's payroll, a service which provided no value to ASC.

66.      Beginning in November 2012, Burkhart and Benson directed ASC employees to work directly with Ganote to transition ASC's speech therapists from the Company's affiliate's payroll to Best Choice and to ensure that the therapists' Best Choice compensation and employment benefits would mirror those they had received while on ASC's affiliate's payroll.

67.      Nothing changed once the transition was complete other than the name of the speech therapists' employer.  Yet, under the new arrangement, Best Choice issued invoices to ASC charging $72.50 per hour per therapist, a substantially higher rate than ASC had paid for the speech

17

therapists while they were on ASC's affiliate's payroll.  Best Choice provided no services of value to ASC.  Its role was limited to issuing fraudulently inflated invoices to ASC.

68.     Throughout 2013, Ganote regularly sent fraudulently inflated invoices to ASC for speech therapy services on behalf of Best Choice via United States Mail, and the inflated invoices and kickbacks to the Burkhart/Benson Enterprise were paid via checks sent using the United States Mail or wire transactions.

69.     Burkhart and Benson received quarterly kickback payments from Best Choice.

70.     After a year of paying Best Choice to employ ASC's speech therapists at an inflated rate, Burkhart and Benson directed ASC to switch the therapists back to ASC's affiliate's payroll in May 2014.

71.     In May 2014, around the time the speech therapists were transferred back to ASC's affiliate's payroll, Burkhart, on behalf of ASC, and Ganote, on behalf of Ganote's shell company, BTS Solutions, executed a sham consulting agreement.

72.     The consulting agreement falsely stated that BTS Solutions would (1) assist ASC in transferring Best Choice employees back to ASC or its affiliates; (2) provide certified professional education to the Company's speech therapists through 2014; (3) provide recruiting services to ASC through 2014; and (4) assist ASC in developing relationships with third-party speech therapy contracting companies through 2014.  No representative of BTS Solutions provided such services.

73.     Pursuant to the sham consulting agreement, Burkhart and Werner caused ASC to wire $60,000 in fees to BTS Solutions on a monthly basis for 8 months, totaling approximately $500,000 in fictitious consulting fees.

74.     As a result of this scheme, the Executive Defendants, Ganote, BTS Ventures, BTS Solutions, and others were fraudulently enriched.

## PREDICATE ACTS ASSOCIATED WITH SCHEME 2: BTS VENTURES AND BTS SOLUTIONS

75.     In relation to the scheme described in paragraphs 65-74 above, the Executive Defendants, Ganote, BTS Ventures, and BTS Solutions committed the following acts of racketeering, any one of which constitutes a predicate act under Scheme 2:

### PREDICATE ACT 3

a.     On or about October 11, 2013, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check to BTS Ventures LLC in the amount of $515,692.60 to pay a fraudulently inflated invoice in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 4

b.     On or about November 15, 2013, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check to BTS Ventures LLC in the amount of $809,227.02 to pay a fraudulently inflated invoice in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 5

c.     On or about February 14, 2014, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check to BTS Ventures LLC in the amount of $717,333.26 to pay a fraudulently inflated invoice in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 6

d.     On or about June 20, 2014, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and

fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check to BTS Solutions LLC in the amount of $120,000 to satisfy the terms of the sham consulting agreement in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 7

e.     On or about November 27, 2014, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check to BTS Solutions LLC in the amount of $60,000 to satisfy the terms of the sham consulting agreement in violation of United States Code, Title 18, Section 1341.

**C.**     **Finite Capital (d/b/a Healthcare by Design) ("HBD")**

76.     <u>Summary of Fraudulent Scheme:</u> HBD is a shell company created by Burkhart, Benson, Ganote, and others associated with the Burkhart/Benson Enterprise.  HBD acted as the middleman between ASC and suppliers of scent air machines and patient lifts.  HBD's service was limited to receiving and paying the true supplier's invoices and then billing the Facilities at grossly inflated prices so that the Burkhart/Benson Enterprise could reap the benefits of the fraudulently obtained funds.

**1)**     **Scent Supplies**

77.     Between 2011 and 2014, Company B, an international air freshener company, provided scent devices, as well as cartridges for those devices, to every Facility.

78.     In 2014, at Burkhart's direction, Ganote contacted an account executive for Company B and asked if she would partner with HBD to sell scent cartridges to ASC.  During the meeting, Ganote falsely claimed that he was a representative of ASC.  Ganote and the account executive agreed to a negotiated price of $74 per scent cartridge.  Ganote subsequently informed Company B that the name of his company was HBD and that HBD was acting as ASC's representative.

79.     In September 2014, Company B and Ganote (on behalf of HBD) signed a 24-month global corporate agreement for the provision of scent cartridges to ASC.  Pursuant to the global agreement, Company B provided the Facilities with four scent cartridges per month at a cost of $74 per cartridge, for a total of $296 per month per Facility.  Several addenda to the initial agreement were subsequently signed by Company B and Ganote in order to add additional Facilities and cartridges.

80.     Company B submitted one consolidated invoice per month to HBD for the cartridges, and HBD in turn paid Company B.  HBD would then issue false invoices to ASC, charging an improperly inflated price for these same cartridges, despite adding nothing of value to the ASC-Company B relationship.  Specifically, Company B invoiced HBD at a price of $74 per cartridge, and HBD billed ASC at a price of $100 per cartridge.

81.     Burkhart and Benson directed the Facilities that they were required to use Company B's products and to obtain them from Ganote or another HBD representative.  In fact, the cartridges were automatically shipped to the Facilities, regardless of whether the Facilities placed an order.

82.     Between October 2014 and April 2015, the Executive Defendants and Ganote caused ASC to pay monthly inflated invoices issued by HBD ranging from $27,000 to $32,000 for scent cartridges.

83.     In addition to the monthly costs for scent cartridges, in December 2014, Burkhart directed Werner to pay a HBD invoice for over $120,000 for the purported purchase of the scent machines when in fact the machines were actually owned by Company B and not for sale.  Werner paid the false invoice without question.

84.     As a result of this scheme, the Executive Defendants, Ganote, HBD and others were fraudulently enriched.

**PREDICATE ACTS ASSOCIATED WITH SCHEME 3: HBD (SCENT SUPPLIES)**

85.      In relation to the scheme described in paragraphs 77-84 above, the Executive Defendants, Ganote, and HBD committed the following acts of racketeering, any one of which constitutes a predicate act pursuant to Scheme 3:

### PREDICATE ACT 8

a.      On or about October 1, 2014, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a fraudulently inflated invoice for scent machines and scents to ASC totaling $27,200 in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 9

b.      On or about November 1, 2014, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a fraudulently inflated invoice for scent machines and scents to ASC totaling $27,700 in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 10

c.      On or about December 1, 2014, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a fraudulently inflated invoice for scent machines and scents to ASC totaling $30,300 in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 11

d.      On or about April 17, 2015, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check from ASC to HBD in the inflated amount of $31,200 in violation of United States Code, Title 18, Section 1341.

2)   **Patient Lifts**

86.     Between 2011 and 2014, HBD also served as the intermediary between ASC and Company C, a global medical technology company that sold patient lifts.  The leaders and members of the Burkhart/Benson Enterprise directed HBD to issue false invoices to ASC that overcharged the Company for patient lifts.  The inflated portion of the charges was shared among members of the Burkhart/Benson Enterprise.

87.     In the fall of 2014, Burkhart and Benson directed ASC employees to purchase new Company C lifts through HBD and falsely represented to ASC employees that HBD would charge ASC the same price that Company C charged for the lifts.

88.     At the direction of Burkhart and Benson, ASC employees purchased 141 Company C lifts in December 2014.

89.     During the spring of 2015, at Ganote's direction, Company C sent Ganote a consolidated invoice for the patient lifts in the amount of $895,000 via email.

90.     In turn, Ganote marked up Company C's prices and falsely charged ASC, via HBD, almost $1.3 million for the Company C patient lifts.  HBD added no value to the transaction.  The proceeds of the falsely inflated portion of the invoice was shared among Burkhart, Benson, Ganote, and other members of the Burkhart/Benson Enterprise.

91.     As a result of this scheme, the Executive Defendants, Ganote, HBD and others were fraudulently enriched.

**PREDICATE ACTS ASSOCIATED WITH SCHEME 4: HBD (PATIENT LIFTS)**

92.     In relation to the scheme described in paragraph 86-91 above, Burkhart, Benson, Ganote, and HBD committed the following acts of racketeering, any one of which constitutes a predicate act pursuant to Scheme 4:

## PREDICATE ACT 12

a.   On or about February 6, 2015, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, at least 51 separate instances of fraudulently inflated invoices to ASC totaling nearly $1.3 million in violation of United States Code, Title 18, Section 1341.

## PREDICATE ACT 13

b.   On or about February 20, 2015, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check to HBD in the amount of $1,298.049.62 to pay fraudulently inflated invoices submitted by HBD in violation of United States Code, Title 18, Section 1341.

**D.**   **Heartland Flag**

93.   Summary of Fraudulent Scheme: Heartland Flag ("Heartland") is a shell company owned by Josh Burkhart (Burkhart's brother) and was ASC's preferred provider of flags between 2009 and 2015. During this period, at the direction of the leaders and members of the Burkhart/Benson Enterprise, Heartland supplied each of the Facilities with flags three or four times per year, even if replacement flags were not needed, and overcharged ASC for the flags. The profits resulting from the overcharges were delivered to the leaders and members of the Burkhart/Benson Enterprise.

94.   In 2009, the Executive Defendants conspired with Josh Burkhart to sell flags to ASC at a significant markup and pocket the profit. At Burkhart's direction, Benson informed ASC employees that each Facility would begin receiving automatic shipments of new flags from Heartland four times per year (the frequency was reduced to three times per year in 2012). The flags arrived at the Facilities every few months, regardless of whether the old flags needed to be replaced.

24

95.     Benson refused to disclose to an ASC employee the cost of the flags, despite the employee's requests for pricing information.

96.     Based on information and belief, Josh Burkhart used an alias when communicating via email and telephonically with ASC employees on behalf of Heartland to conceal the scheme and the fact that Heartland was a shell company owned by Burkhart's brother.  Josh Burkhart falsely represented that his name was Justin Barnes and utilized the email address justin.barnes@heartlandflag.com when communicating with ASC employees about flag orders.

97.     Heartland sent one consolidated invoice to ASC's home office three or four times per year, and Werner paid the invoices via checks mailed to Heartland's business address.  Werner knew that Heartland's mailing address was the same address used by another ASC vendor entity that was owned by Burkhart's brother, Josh Burkhart.

98.     ASC paid Heartland approximately $180,000 each year for all the Facilities that ASC managed for HHC when it was buying three flags per Facility per year and nearly $240,000 per year when it was purchasing four flags per Facility per year.

99.     Josh Burkhart, on behalf of Heartland, purchased the flags for the Facilities from another entity and charged ASC approximately 150% more than Heartland paid for the flags. Heartland added no value to the sales transactions and was merely used as a means to provide kickbacks to the Burkhart/Benson Enterprise.

100.    As a result of this scheme, the Executive Defendants, Josh Burkhart, Heartland and others were fraudulently enriched.

### PREDICATE ACTS ASSOCIATED WITH SCHEME 5:  HEARTLAND FLAG

101.    In relation to the scheme described in paragraphs 93-100 above, the Executive Defendants, Josh Burkhart and Heartland committed the following acts of racketeering, any one of which constitutes a predicate act associated with Scheme 5:

### PREDICATE ACT 14

a.      On or about August 4, 2014, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing an artificially inflated invoice to ASC for flags in the amount of $30,707.93 in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 15

b.      On or about December 7, 2014, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing an artificially inflated invoice to ASC for flags in the amount of $31,605.51 in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 16

c.      On or about April 17, 2015, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check from ASC to Heartland Flag in the amount of $32,109.63 to satisfy Heartland's artificially inflated invoice in violation of United States Code, Title 18, Section 1341.

**E.      Indiana Uniform Company LLC ("Indiana Uniform")**

102.    <u>Summary of Fraudulent Scheme:</u> In 2013, Burkhart and Ganote created a shell company called Indiana Uniform to purchase uniforms, door/van wraps, luggage, and t-shirts from another supplier and then resell the products to ASC at an artificially inflated price.  The inflated portion of the charges were shared among members of the Burkhart/Benson Enterprise.

103.    Between 2007 and 2013, ASC purchased t-shirts, uniforms, luggage bags, and iPad covers from a company owned by Individual A.  In 2013, Burkhart approached Individual A and proposed starting a new company called Indiana Uniform that would buy uniforms from a third party and then sell them to the Facilities.  Burkhart offered to pay Individual A a $60,000 annual

salary to manage Indiana Uniform.  Burkhart further stated that Ganote would be the "financial guy" and that Burkhart and Ganote would cover all of the business' costs.  Individual A agreed to the proposal.

104.    Starting in 2013, Burkhart and Benson directed the Facilities to purchase their uniforms through Indiana Uniform.  Indiana Uniform issued false invoices to ASC that artificially inflated the prices on these uniforms by 50%, and sometimes as much as 200%, despite adding no value to the transactions.

105.    ASC employees continually complained about the cost of the uniforms and the quality of Indiana Uniform's services to Benson, but he ignored their concerns.

106.    Burkhart also ordered 20,000 patient discharge packages from Indiana Uniform for the Facilities.  Indiana Uniform obtained the packages from a Chinese manufacturer for $15 each.  At Burkhart's direction, Indiana Uniform issued fraudulent invoices to ASC, charging ASC $30.50 per discharge package.  Burkhart, Benson and Ganote knew that the price charged to ASC for the discharge packages was improperly inflated.

107.    Indiana Uniform also sold door wraps (which impose images of landscapes on doors) to the Facilities four times per year at Burkhart's and Benson's direction.  In total, Indiana Uniform sold 214 door wraps to ASC.  Indiana Uniform's cost for each wrap was $600; it issued invoices charging ASC $2,250 per wrap, a grossly inflated price.

108.    Burkhart and Benson directed ASC employees to purchase door wraps every few months from Indiana Uniform, despite the ASC employees' complaints that the door wraps did not need to be replaced and that the prices of the door wraps were commercially unreasonable.  Benson told an ASC employee that although Indiana Uniform's prices were high, they needed to "make [Burkhart] happy with his selection."

109.    At Burkhart's and Benson's direction, ASC purchased several other products from Indiana Uniform at grossly inflated prices, including centenarian packages, luggage carts, elevator and van wraps, and t-shirts.

110.    Burkhart sent Indiana Uniform invoices to Werner to prepare checks for Burkhart's signature.  Werner prepared these checks without question, even when he knew that large payments were being made to Indiana Uniform for products that could not be used for over a year.

111.    Burkhart and Ganote directed Indiana Uniform to send the marked up amounts to Burkhart, Benson, and Ganote in the form of kickbacks.

112.    Benson admitted that Indiana Uniform personally paid him between $75,000 and $100,000 at the end of 2014.

113.    As a result of this scheme, the Executive Defendants, Ganote, Indiana Uniform and others were fraudulently enriched.

### PREDICATE ACTS ASSOCIATED WITH SCHEME 6:  INDIANA UNIFORM

114.    In relation to the scheme described in paragraphs 102-113 above, the Executive Defendants, Ganote, and Indiana Uniform committed the following acts of racketeering, any one of which constitutes a predicate act associated with Scheme 6:

### PREDICATE ACT 17

a.    On or about August 30, 2013, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check to Indiana Uniform in the amount of $438,500 to satisfy Indiana Uniform's artificially inflated invoice in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 18

b.    On or about October 4, 2013, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered

through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check to Indiana Uniform in the amount of $499,941.41 to satisfy Indiana Uniform's artificially inflated invoice in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 19

c.  On or about November 14, 2014, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing two checks to Indiana Uniform in the amounts of $454,839.45 and $567,408.90 to satisfy two of Indiana Uniform's artificially inflated invoices in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 20

d.  On or about May 8, 2015, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check to Indiana Uniform  in the amount of $250,299.85 to satisfy Indiana Uniform's artificially inflated invoice in violation of United States Code, Title 18, Section 1341.

**F.**     **Med-Healthline**

115.    Summary of Fraudulent Scheme: In April 2015, Burkhart directed Company D, a supplier of disposable medical supplies and equipment, to redirect funds owed to ASC in the form of rebates to Med-Healthline, a shell company owned by members of the Burkhart/Benson enterprise.

116.    In April 2015, Burkhart informed Company D that Med-Healthline had the ASC supply contract for medical supplies and that Company D would need to deal directly with Med-Healthline and provide an 11% rebate on its products in order to have ASC as a customer.

117.    On May 1, 2015, Company D entered into a supply agreement with Med-Healthline, which stated that Med-Healthline would receive an 11% "discount" on products Company D sold to ASC if Company D's invoices were paid on time.

118.    On the same day, Burkhart, on behalf of ASC, and Med-Healthline, a company owned in part by Burkhart, entered into a supply agreement for medical supplies.  The agreement failed to disclose that Company D was the true supplier, that Med-Healthline was adding no value to the sales transactions, or that Company D was providing an 11% rebate on products for ASC.

119.    Burkhart and Benson concealed from ASC's owners that Burkhart was a part-owner of Med-Healthline and further concealed that Company D was sending ASC's 11% rebates to Med-Healthline.

120.    Company D sent its invoices to the Facilities, which in turn sent them to ASC's home office.  The invoices directed ASC to send payments to Med-Healthline.  Once Med-Healthline received payment from ASC, Ganote sent 89% of the payment to Company D and kept the remaining 11% as a kickback to be shared between Burkhart, Benson and himself.

121.    Burkhart falsely stated to ASC employees that payments for Company D's products had to be made to Med-Healthline because HHC required ASC to use a local, Indiana-based company.

122.    Burkhart and Benson required ASC to use Company D, even when other vendors offered better prices or products.

123.    Werner oversaw payment of Company D's invoices and knew that payments were being sent to Med-Healthline, even though the invoices were issued by Company D.

124.    Burkhart attempted to conceal the scheme in part by directing Company D's representative to communicate only with Burkhart about Company D's sales to ASC.

125.    Benson admitted that he personally received approximately $10,000 per month in kickbacks from the Company D relationship.

126.    As a result of this scheme, the Executive Defendants, Ganote, Med-Healthline and others were fraudulently enriched.

## PREDICATE ACTS ASSOCIATED WITH SCHEME 7: MED-HEALTHLINE

127.    In relation to the scheme described in Paragraphs 115-126 above, the Executive Defendants, Ganote, and Med-Healthline committed the following acts of racketeering any one of which constitutes a predicate act pursuant to Scheme 7:

### PREDICATE ACT 21

a.    On or about May 29, 2015, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check to Med-Healthline Supply in the amount of $138,952.75 to pay a fraudulently inflated invoice in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 22

b.    On or about July 3, 2015, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check to Med-Healthline Supply in the amount of $142,220.37 to pay a fraudulently inflated invoice in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 23

c.    On or about August 21, 2015, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check to Med-Healthline Supply in the amount of $205,144.75 to pay a fraudulently inflated invoice in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 24

d.    On or about September 11, 2015, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered

through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check to Med-Healthline Supply in the amount of $155,117.15 to pay a fraudulently inflated invoice in violation of United States Code, Title 18, Section 1341.

## G.     Oregon Properties

128.     Summary of Fraudulent Scheme: Between March and September 2015, Oregon Properties overcharged and double-charged ASC for rent on a property located at 2920 East 96th Street ("the Property"). The Executive Defendants directed ASC employees to pay the rent on this property that was to be utilized for ASC Operations personnel and the training of ASC employees. During the relevant time period, Oregon Properties was owned by Ganote and Burkhart.

129.     Burkhart concealed his ownership interest in Oregon Properties from ASC's owners and employees.

130.     Gemeni Properties, owned by Ganote, purchased the Property in February 2015. Gemeni Properties paid approximately $1,000,000 for the Property, and the funds came from shell companies owned by Burkhart, Benson, and Ganote, including Finite Capital. Gemeni leased the Property to Oregon Properties for $16,000 per month. Acting as a sub-lessor, Oregon Properties then charged ASC substantially more for the rental of the Property, as detailed below.

131.     There were two sub-leases for the Property between Oregon Properties (the sub-lessor) and ASC (the sub-lessee). The first lease was dated March 1, 2015 and was for the sublease of 2920 East 96th Street (Suites A, B, C and D). The amount of the rent was $48,250 per month. The lease was signed by Ganote on behalf of Oregon Properties and by Burkhart on behalf of ASC. Prior to execution of the lease, Burkhart instructed Werner on how to wire the lease payments to Oregon Properties.

132.    The second sub-lease was dated July 1, 2015 and was for the sublease of 2920 East 96th Street (Suite A).  The amount of the rent was $32,000 per month.  This lease, too, was signed by Ganote on behalf of Oregon Properties and by Burkhart on behalf of ASC.

133.    In July, ASC began paying both lease amounts for a total of $88,750 per month. Despite the fact that both leases purported to cover Suite A, the second lease was not an amendment to the original March 1st lease.  Rather, Burkhart instructed Werner to pay both leases even though they were for the same space, and Werner agreed to do so.

134.    As a result of this scheme, the Executive Defendants, Ganote, Oregon Properties and others caused losses to ASC.

## PREDICATE ACTS ASSOCIATED WITH SCHEME 8:  OREGON PROPERTIES

135.    In relation to the scheme described in paragraphs 128-134 above, the Executive Defendants, Ganote, and Oregon Properties committed the following acts of racketeering, any one of which constitutes a predicate act associated with Scheme 8:

### PREDICATE ACT 25

a.      On or about February 27, 2015, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check from ASC to Oregon Properties in the amount of $48,250 to satisfy Oregon Properties' artificially inflated lease agreement in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 26

b.      On or about May 1, 2015, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check from ASC to Oregon Properties in the amount of $56,750 to satisfy Oregon Properties' artificially inflated lease agreement in violation of United States Code, Title 18, Section 1341.

33

## PREDICATE ACT 27

c.   On or about July 1, 2015, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check from ASC to Oregon Properties in the amount of $88,750 to satisfy Oregon Properties' artificially inflated lease agreement in violation of United States Code, Title 18, Section 1341.

## PREDICATE ACT 28

d.   On or about July 31, 2015, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check from ASC to Oregon Properties in the amount of $88,750 to satisfy Oregon Properties' artificially inflated lease agreement in violation of United States Code, Title 18, Section 1341.

**H.   Force Holding Company ("Force Holding")**

136.   Force Holding is a shell company owned by Ganote that was involved in transactions related to ASC's purchase of alarm systems and safety devices, wound care items, and food products.   Force did not provide any value to ASC and was utilized by the Burkhart/Benson Enterprise to inflate ASC's vendor invoices, receive the inflated portion of ASC's payments, and distribute the profits among the members of the Burkhart/Benson Enterprise.

**1)   Alarm Services and Safety Systems**

137.   Summary of Fraudulent Scheme:  Company E sold generators, nurse call systems, fire alarm systems and other safety devices and services to ASC.  Burkhart directed Company E to overcharge the Facilities for its products and services and to use those funds to pay kickbacks to Ganote via his company Force Holding.

138.   In December 2013, a representative of Company E received a call from Ganote, who requested information about services Company E could provide to ASC.  The two set up an

34

initial meeting.  At this meeting, they discussed ASC's needs and Company E's services, including nurse call systems.

139.    Approximately a week later, Ganote requested a follow-up meeting, which, this time, also included Burkhart.  During this meeting, Burkhart told the Company E representative that the prices Company E charged ASC for any new products or services should include a 23% finder's fee for Ganote, despite the fact that ASC had already been doing business with Company E for years.  The representative agreed that Company E would pay Ganote finder's fees and that the fees would be wrapped into the prices that Company E charged to ASC.  The same month, the Company E representative signed a written contract stating that the finder's fees would be paid to Ganote via Force Holding.

140.    Burkhart subsequently directed Company E to increase Ganote's finder's fee to 35% of what it charged ASC for its products and services and to wrap the finder's fee into the prices it charged ASC.  Company E followed those instructions, issuing false invoices to ASC that artificially inflated its prices up to 35% and remitting corresponding kickbacks to Ganote via Force Holding.  Neither Force Holding nor Ganote added any value to the services provided by Company E and were merely used as a means to provide kickbacks to the Burkhart/Benson Enterprise.

141.    Burkhart and Benson directed ASC employees to use Company E as a vendor, even when competitors offered better prices and higher quality services.  Benson even directed the use of Company E for services it was not qualified to perform, including bus lift maintenance.

142.    Consistent with their pattern, once the Executive Defendants found a vendor who would kickback money to them or their co-conspirators, they increased the volume of goods and services purchased from that vendor in order to maximize the kickbacks.  Beginning in early 2014, Company E installed nurse call systems, door lock systems, generators, and camera systems at the

Facilities. In July 2014, the Executive Defendants directed ASC employees to begin using Company E for inspections of electrical equipment, resident lifts, and transport vehicle lifts. Between August 2014 and the fall of 2015, Company E also provided maintenance services for the Facilities' fire alarm systems, exit lights, nurse call systems, camera systems, door alarm systems, generators, sprinkler systems, among other items.

143.     ASC employees complained about Company E's work for ASC, including delays in their repair efforts, ineptitude in performing maintenance work, vague invoices, and excessive charges. The employees also pointed out that Company E had been retained to perform services that were unnecessary for certain buildings. When ASC employees complained that Company E's prices seemed unnecessarily high, Burkhart falsely stated that the costs temporarily would be higher as a result of transitioning Company E to replace the services of multiple vendors.

144.     Burkhart directed Company E to send its false invoices directly to him. Burkhart then gave the invoices to Werner for payment.

145.     Benson personally received approximately $20,000 per quarter in kickbacks from the Company E relationship between early 2014 and September 2015.

146.     As a result of this scheme, the Executive Defendants, Ganote and Force Holding were fraudulently enriched.

**PREDICATE ACTS ASSOCIATED WITH SCHEME 9: FORCE HOLDING (ALARM SERVICES)**

147.     In relation to the scheme described in Paragraphs 137-146, the Executive Defendants, Ganote, and Force Holding committed the following acts of racketeering, any one of which constitutes a predicate act to associated with Scheme 9:

**PREDICATE ACT 29**

a.     On or about March 28, 2014, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and

36

fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check in the amount of $251, 257.78 to satisfy one of Company E's artificially inflated invoices in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 30

b.  On or about July 3, 2014, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check in the amount of $310,109.54 to satisfy one of Company E's artificially inflated invoices in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 31

c.  On or about August 8, 2014, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check in the amount of $463,840.15 to satisfy one of Company E's artificially inflated invoices in violation of United States Code, Title 18, Section 1341.

### 2)   **Wound Care Products**

148.   <u>Summary of Fraudulent Scheme:</u> Cardinal Distribution is a shell company created by Ganote and owned by Force Holding.  Cardinal Distribution sold medical supplies to ASC at a price that was artificially inflated by 40% (i.e., 28.57% of the inflated sales price).  Cardinal used the excess funds to pay kickbacks to the Executive and Vendor Defendants.

149.   Ganote created Cardinal Distribution to distribute to ASC the products of Company F, a manufacturer of medical supplies, including wound care supplies, shampoo, glucometers, glucometer strips, lancets and medical soap.

150.   In the spring of 2013, Ganote approached the CEO of Company F about undertaking a joint venture to distribute Company F's products to ASC.  Benson subsequently

promised the CEO that he would persuade ASC's employees to use Company F's products that could be supplied by Cardinal Distribution.

151.    In approximately July 2013, Burkhart, Ganote and the CEO of Company F agreed that Cardinal Distribution would artificially inflate the prices it charged ASC by 40%, with 10% going to Company F as a "management fee" and the other 30% to the Burkhart/Benson Enterprise via Force Holding.

152.    Neither Force Holding nor Cardinal Distribution provided services of value to ASC.

153.    Burkhart and Benson required ASC employees to use Cardinal Distribution for certain medical supplies, despite the fact that ASC employees told them that Cardinal Distribution charged more than three times what the Company's previous medical supply distributor had charged.

154.    Benson told at least one ASC employee that the Company was using Cardinal Distribution as a favor to Burkhart.

155.    At Burkhart's and Benson's direction, Cardinal Distribution regularly sent false invoices to ASC that contained artificially inflated charges.

156.    As a result of this scheme, the Executive Defendants, Ganote, Force Holding and others were fraudulently enriched.

## PREDICATE ACTS ASSOCIATED WITH SCHEME 9:  FORCE HOLDING (WOUND CARE PRODUCTS)

157.    In relation to the scheme described in paragraphs 148-156 above, Burkhart, Benson, Ganote and Force Holding committed the following acts of racketeering, any one of which constitutes a predicate act in furtherance of Scheme 9:

### PREDICATE ACT 32

a.    On or about September 27, 2013, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and

fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check to Cardinal Distribution in the amount of $28,182.64 in violation of United States Code, Title 18, Section 1341.

## PREDICATE ACT 33

b.      On or about February 28, 2014, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check to Cardinal Distribution in the amount of $32,278.04 in violation of United States Code, Title 18, Section 1341.

## PREDICATE ACT 34

c.      On or about January 30, 2015, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check to Cardinal Distribution in the amount of $35,329.80 in violation of United States Code, Title 18, Section 1341.

### 3)      Food Services

158.    Summary of Fraudulent Scheme:  From approximately early 2014 to September 2015, Burkhart, Benson, and Ganote conspired to obtain kickbacks disguised as group purchasing organization ("GPO") fees from Company G, a food vendor for the Facilities.  Burkhart, Benson, and Ganote arranged for Force Holding to receive these purported GPO fees.  The fees paid to Force Holding were included in the prices that Company G charged the Facilities, even though Force Holding provided no services of value to ASC.

159.    In approximately September 2013, Burkhart, Benson, and Ganote met with Company G's general manger.  Burkhart, Benson and Ganote falsely represented during this meeting that Force Holding was ASC's new GPO for food services and that Force Holding needed to receive an "administrative fee" for its services.  The parties then agreed on a $2.30 per case of

food markup over the cost of the products and further agreed that out of this markup, $1 per case would be paid to Force Holding as an "administrative fee."

160.    Burkhart and Company G memorialized the terms of their deal on October 30, 2013, in an Incentive Program Agreement, resulting in Company G issuing invoices to ASC that contained prices on food cases that were improperly inflated by $1 per case.

161.    As Burkhart and Benson were well aware, Force Holding did not provide any services of value to ASC in return for the $1 per case.

162.    As a result of this scheme, Burkhart, Benson, Ganote, Force Holding and others were fraudulently enriched.

## PREDICATE ACTS ASSOCIATED WITH SCHEME 9:  FORCE HOLDING (FOOD SERVICES)

163.    In relation to the scheme described in Paragraphs 158-162 above, Burkhart, Benson, Ganote, and Force Holding committed the following acts of racketeering any one of which constitutes a predicate act in furtherance of Scheme 9:

### PREDICATE ACT 35

a.      On or about March 13, 2015, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States wires, to be delivered in accordance with the directions thereon, a wire transaction for an "incentive" GPO fee from Company G to Force Holding in the amount of $136,680 in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 36

b.      On or about June 12, 2015, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States wires, to be delivered in accordance with the directions thereon, a wire transaction for an "incentive" GPO fee from Company G to Force Holding in the amount of $141,681 in violation of United States Code, Title 18, Section 1341.

**PREDICATE ACT 37**

c.      On or about September 11, 2015, having devised and intended to devise a
scheme to defraud and to obtain money and property by means of false and
fraudulent pretenses, representations and promises, caused to be delivered
through the United States wires, to be delivered in accordance with the
directions thereon, a wire transaction for an "incentive" GPO fee from
Company G to Force Holding in the amount of $160,061.98 in violation of
United States Code, Title 18, Section 1341.

## II.   KICKBACKS FROM SHAM CIRCLE CONSULTING CONTRACT

164.    Summary of Fraudulent Scheme: In June 2008, Burkhart and Benson directed ASC
to enter into a consulting agreement with Circle Consulting, a company owned by Josh Burkhart,
Burkhart's brother.  Between June 2008 and the fall of 2015, Circle Consulting billed ASC, and
ASC paid Circle Consulting $36,000 each quarter.  However, Circle Consulting never provided
any consulting services of value to ASC.

165.    In June 2008, under the direction of Burkhart and Benson, ASC entered into a
consulting agreement with Circle Consulting pursuant to which ASC would pay Circle Consulting
$144,000 per year for consulting regarding ASC's business locations, internal
marketing/development, and general advising services.

166.    For the next seven years, Circle Consulting billed ASC, and ASC paid Circle
Consulting $36,000 each quarter.

167.    The invoices from Circle Consulting to ASC falsely stated that Circle Consulting
provided Medicaid rate consulting services, not the services specified in the consulting agreement.
Neither Circle Consulting nor Josh Burkhart on behalf of Circle Consulting provided services of
value or any of the services specified in either the consulting agreement or the invoices.

168.    Werner paid the Circle Consulting invoices at Burkhart's direction without
verifying that services were provided by Circle Consulting and despite knowing that Josh
Burkhart, Burkhart's brother, owned Circle Consulting.  Werner also knew that ASC did not retain

Circle Consulting to provide Medicaid consulting services because Bradley and Associates performed those services for ASC.  Finally, Werner knew that Josh Burkhart was a salaried employee at Bradley and Associates during the time Josh Burkhart purportedly owned and operated Circle Consulting.

169.    As a result of this scheme, the Executive Defendants, Josh Burkhart, and Circle Consulting caused losses to ASC.

## **PREDICATE ACTS ASSOCIATED WITH SCHEME 10:  CIRCLE CONSULTING**

170.    In relation to the scheme described in paragraphs 164-169 above, the Executive Defendants, Josh Burkhart, and Circle Consulting committed the following acts of racketeering, any one of which constitutes a predicate act associated with Scheme 9:

### **PREDICATE ACT 38**

a.      On or about July 22, 2008, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check to Circle Consulting from ASC in the amount of $72,000 in violation of United States Code, Title 18, Section 1341.

### **PREDICATE ACT 39**

b.      On or about July 27, 2012, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a fraudulent invoice from Circle Consulting to ASC in the amount of $36,000 in violation of United States Code, Title 18, Section 1341.

### **PREDICATE ACT 40**

c.      On or about July 31, 2014, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a fraudulent invoice from Circle

Consulting to ASC in the amount of $36,000 in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 41

d.    On or about July 25, 2014, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check from ASC to Circle Consulting in the amount of $36,000 to satisfy the terms of the sham consulting agreement in violation of United States Code, Title 18, Section 1341.

## III.    <u>PROVISION AND CONCEALMENT OF UNAPPROVED BONUSES</u>

171.    Beginning at least by 2011 and continuing until September 15, 2015, the Executive Defendants caused ASC to pay them millions of dollars in excessive compensation, including by directing ASC's accounting staff to pay them quarterly bonuses that ASC's owners did not know about or approve.

172.    The Executive Defendants knew that these bonuses were not approved by ASC's owners because the quarterly bonuses were not included in the compensation terms of their employment agreements and/or their employment agreements were not signed by or otherwise approved by ASC's owners.

173.    Burkhart directed Werner to engage in improper accounting practices to hide these unapproved bonuses, including redirecting these bonus allocations from ASC's salary account to Burkhart's own special ASC expenditure account that he utilized for his fraudulent schemes, namely 20120 ("other accruals"), and ultimately using ASC's management fee revenue to pay back the debits in Burkhart's special account, without the approval or knowledge of ASC's owners.

174.    In total, for this fraudulent scheme, the Executive Defendants caused ASC to pay them more than $14.1 million in improper and unauthorized bonuses between 2011 and 2015.

## PREDICATE ACTS ASSOCAITED WITH BURKHART BONUSES

175.     In relation to the scheme described in paragraphs 171-174 above, the Executive

Defendants committed the following acts of racketeering by paying outsized bonuses to Burkhart,

any one of which constitutes a predicate act associated with the third category of schemes:

### PREDICATE ACT 42

a.      On or about June 22, 2011, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States wires, to be delivered in accordance with the directions thereon, a wire transaction from ASC to Burkhart an inflated bonus of $120,000 in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 43

b.      On or about October 17, 2011, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States wires, to be delivered in accordance with the directions thereon, a wire transaction to provide an inflated bonus from ASC to Burkhart in an amount of $135,000 in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 44

c.      On or about December 6, 2012, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States wires, to be delivered in accordance with the directions thereon, a wire transaction for an inflated bonus from ASC to Burkhart in an amount of $175,000 in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 45

d.      On or about July 1, 2015, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States wires, to be delivered in accordance with the directions thereon, a wire transaction for an inflated bonus from ASC to Burkhart in an amount of $188,000 in violation of United States Code, Title 18, Section 1341.

## PREDICATE ACTS ASSOCIATED WITH BENSON BONUSES

176.   In relation to the scheme described in paragraphs 171-174 above, the Executive Defendants committed the following acts of racketeering by paying outsized bonuses to Benson, any one of which constitutes a predicate act associated with the third category of schemes:

### PREDICATE ACT 46

a.   On or about October 17, 2011, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States wires, to be delivered in accordance with the directions thereon, a wire transaction to provide an inflated bonus from ASC to Benson in an amount of $165,000 in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 47

b.   On or about December 6, 2012, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States wires, to be delivered in accordance with the directions thereon, a wire transaction for an inflated bonus from ASC to Benson in an amount of $200,000 in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 48

c.   On or about July 1, 2015, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States wires, to be delivered in accordance with the directions thereon, a wire transaction for an inflated bonus from ASC to Benson in an amount of $325,000 in violation of United States Code, Title 18, Section 1341.

## PREDICATE ACTS ASSOCIATED WITH WERNER BONUSES

177.   In relation to the scheme described in paragraphs 171-174 above, the Executive Defendants committed the following acts of racketeering by paying outsized bonuses to Werner, any one of which constitutes a predicate act associated with the third category of schemes:

### PREDICATE ACT 49

a.      On or about October 17, 2011, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States wires, to be delivered in accordance with the directions thereon, a wire transaction to provide an inflated bonus from ASC to Werner in an amount of $135,000 in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 50

b.      On or about December 6, 2012, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States wires, to be delivered in accordance with the directions thereon, a wire transaction for an inflated bonus from ASC to Werner in an amount of $150,000 in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 51

c.       On or about July 1, 2015, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States wires, to be delivered in accordance with the directions thereon, a wire transaction for an inflated bonus from ASC to Werner in an amount of $200,000 in violation of United States Code, Title 18, Section 1341.

## IV.    REIMBURSEMENT OF INAPPROPRIATE EXPENDITURES

### A.    Gifts and Entertainment

178.    Burkhart and Benson also caused ASC to reimburse excessive and inappropriate costs for their benefit, including personal travel and entertainment.

179.    Between 2012 and 2015, Burkhart and Benson charged excessive expenses to ASC, including but not limited to:

- Over $1.6 million for sporting events;
- Over $234,000 in charitable contributions;
- Over $217,000 for gifts;

- Over $73,000 for gift cards;

- Over $140,000 for travel to China;

- Over $367,000 for business travel;

- Over $289,000 in travel expenses for personal travel; and

- Nearly $40,000 in political contributions.

180.   Some of the personal travel expenses were for golf trips for Burkhart and his associates to some of the most expensive golf resorts in the country.  Burkhart and others often traveled to these resorts by private jets paid for with ASC's funds.  Burkhart and others enjoyed the services of private masseuses and charged those expenses as well to ASC.

181.   Burkhart and Benson submitted to ASC requests for reimbursements for these expenditures that falsely stated and or concealed the true purpose of the expenditures.

182.   Burkhart and Benson were well aware that these personal expenditures violated the terms of their employment agreements and ASC's employee policies.

183.   In an effort to conceal the beneficiaries of Burkhart's excessive spending on golf trips, Burkhart directed his executive assistant to provide only his guests' first names to the golf resort, and to use "Burkhart" as the last name for each guest.  Burkhart further directed his executive assistant to always book private dining rooms for him and his guests and to book the spa treatments for after hours.

184.   In total, ASC paid over $3.1 million between 2012 and 2015 as a result of Burkhart's and Benson's fraudulent expense reimbursement requests.

### PREDICATE ACTS ASSOCATIATED WITH GIFTS AND ENTERTAINMENT

185.   In relation to the scheme described in paragraphs 178-184 above, Burkhart and Benson committed the following acts of racketeering, any one of which constitutes a predicate act associated with fourth category of schemes:

### PREDICATE ACT 52

a.      On or about June 7, 2013, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing an invoice to ASC from The Greenbrier, a golf resort, in the amount of $25,401.60 in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 53

b.      On or about August 7, 2013, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing a check from ASC to Brinker's Jewelers in the amount of $80,464 to pay for eight watches that were subsequently distributed by the Executive Defendants in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 54

c.      On or about June 10, 2014, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing an invoice to ASC from The Greenbrier, a golf resort, in the amount of $31,905.24 in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 55

d.      On or about September 27, 2014, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States wires, to be delivered in accordance with the directions thereon, a wire transaction from ASC to Raleigh Limited Inc. for $10,000 worth of gift cards in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 56

e.      On or about June 11, 2015, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States Mail, to be delivered in accordance with the directions thereon, an envelope containing an invoice to ASC from The

Greenbrier, a golf resort, in the amount of $32,756.94 in violation of United States Code, Title 18, Section 1341.

## V.    FRAUDULENT MISDIRECTION OF CORPORATE OPPORTUNITIES

186.    Burkhart, Benson, and certain Vendor Defendants, as set forth below, fraudulently misdirected corporate opportunities that should have gone to ASC through false statements and material omissions.  These fraudulent schemes involved the following activities, perpetuated by the Burkhart/Benson Enterprise through habitual mail and wire fraud:

### A.    Real Estate Transactions Involving Put and Consulting Payments to Burkhart-Controlled Entities

187.    Between 2003 and 2015, when Facilities were purchased and brought into the HHC/ASC network of Facilities, HHC and ASC executed new management agreements (or amended existing agreements) to govern their relationship.

188.    Beginning in January 2003 and several times thereafter, through approximately February 2012, ASC's owners/affiliates entered into agreements to lease Facilities to HHC and to sell the personal property of the Facilities to HHC.  This was done pursuant to various lease agreements and asset purchase agreements.  Each time this occurred, HHC and ASC entered into a management agreement or amended existing managements agreements providing for ASC's management of the daily operations of these Facilities.   These agreements contained "put" provisions which required another entity to stand in HHC's shoes under certain circumstances.

189.    The put provisions in these initial agreements with ASC affiliates transferred all of its operational responsibility for the Facilities and its related lease obligations to ASC's owners, prior to the lease expiration dates, if HHC chose to exit the nursing home operations.  The asset purchase agreements between HHC and ASC's owners called for HHC to pay the owners a "put payment" if, and only after, HHC actually exercised the put option requiring ASC's ownership group to assume HHC's duties as the lessee and licensed operator of these Facilities. The put

payment in these early transactions between HHC and ASC's owners was intended to provide ASC's owners, acting as the "putees," with sufficient short term operating capital to be able to assume the operational and lease obligations related to the subject Facilities.

190.    Between August 2012 and July 2015, Burkhart, purportedly acting as ASC's representative, was involved in numerous transactions (hereinafter referred to as "the later transactions") involving (1) HHC's acquisition of the operations and leases of nursing homes from third parties and (2) the sale of certain Facilities' real estate to third parties (i.e., "lessors"). Each of these transactions resulted in ASC and HHC entering into new management agreements providing for ASC's management of the daily operations of these Facilities.

191.    During the course of negotiating and executing the later transactions, Burkhart made false statements to ASC's owners and failed to disclose material information to them in order to fraudulently divert to himself millions of dollars that otherwise would have gone to ASC's owners. Burkhart's misrepresentations and material omissions, as detailed below, enabled his own Crusader entities to act as the "putee" for HHC instead of ASC's owners.  In these later transactions (both unbeknownst to ASC's owners and unlike the put terms in the earlier transactions with the owners), HHC agreed to pay and did pay Burkhart's Crusader entities upfront put payments upon the closing of each transaction, all pursuant to put agreements between HHC and Burkhart's Crusader entities.  The Crusader entities also entered into put-related agreements with various third party lessors, which called for the third-party lessors to make additional payments to Burkhart's Crusader entities.

192.    For all of the later transactions listed below, Burkhart, via his Crusader entities, fraudulently obtained for himself and other members of the Enterprise the put-related funds that otherwise would have gone to ASC's owners by (1) falsely stating to the owners and/or misleading

them to believe that neither he nor the Crusader entities would earn any funds by agreeing to act as the putee and that the sole benefit to acting as the putee would be Burkhart's ability to continue managing the Facilities if HHC exercised its put option, (2) concealing from the owners the fact that the put-related payment opportunities in the later transactions were substantially better than they were in the past due to the millions of dollars in upfront and installment payments being offered to the putee via put agreements with HHC, covenant support agreements with lessors, and a consulting agreement with a lessor, (3) falsely stating to the third party lessors and HHC that ASC's owners were not interested in the current put opportunities, knowing full well that he had misrepresented the true value of these opportunities to ASC's owners, and (4) making other false statements and material omissions as detailed below.

a.     <u>2012 Omega Healthcare Investors Transactions</u>

193.     In July 2012, the ASC ownership group decided to sell the underlying real property and leases of 17 Facilities to a Real Estate Investment Trust ("REIT") called Omega Healthcare Investors, Inc. ("Omega").  These 17 Facilities were already leased to and operated by HHC under agreements with the ASC owner group.  After this transaction, HHC continued to lease these same Facilities from Omega (rather than the ASC owners) and to act as the licensed operator.  ASC continued to manage these Facilities for HHC as well as another 13 Facilities which had been recently purchased by Omega and leased to HHC.

194.     Once again, HHC agreed to lease and operate these Facilities (now owned by Omega) and sought and obtained a put.

195.     Not knowing that the basic structure of the put arrangement had changed and that ASC had the opportunity to obtain substantial sums of money upfront, throughout the life of the lease, and upon the future exercise of the put, ASC's owners were not interested in ASC accepting puts on properties they no longer owned or never previously owned.  Burkhart did not disclose to

ASC that the Omega Facilities' put opportunity and the later put opportunities detailed below were different from past put agreements with the ASC owners because they involved millions of dollars in upfront and ongoing installment payments to the putee, irrespective of whether the put option was ever exercised.

196.    In the spring of 2012, Burkhart assisted the ASC ownership group in negotiating the sale/purchase price for the 17 Facilities which were to be sold to Omega.  A tentative sale price was agreed upon sometime around March, 2012.  About a month later, Burkhart falsely stated to the ASC ownership group that due to HHC's requirement of a put, Omega had valued the properties at less than the originally discussed sale price and had reduced its offer by approximately $22 million for the collective 17 Facilities.  After much deliberation, the ASC ownership group agreed to the price reduction and proceeded with the sale, which closed toward the end of the summer in 2012. Burkhart told the ASC owners that he and a business associate were forming a company (i.e. a Crusader entity) to take the put, which would enable the transaction to occur and go forward.  Burkhart did not disclose to the ASC ownership group that Omega had agreed to pay his Crusader entity approximately $22 million in "Covenant Support" fees as part of the put transaction.  The sums that Omega agreed to pay to Burkhart, unbeknownst the ASC ownership group, was the same amount as the reduction in the purchase/sale price for the 17 Facilities.

197.    Burkhart (via one of his Crusader entities) and HHC entered into a Put Agreement covering the Omega Facilities on August 31, 2012.  Pursuant to the Put Agreement on the Omega-owned Facilities, Crusader received a $2 million dollar upfront payment.  Pursuant to the Operations and Transfer Agreement between the parties (which was a pre-negotiated agreement that was an exhibit to the Put Agreement), Crusader would receive an additional cash payment of $16.5 million if the put was ever exercised.

198.    Crusader and Omega also entered into a Covenant Support Agreement on August 31, 2012.  Pursuant to this agreement, Omega agreed to pay Crusader a total of $22,535,800 in installment payments (i.e. $1,126,790 every six months commencing on February 28, 2013).  The agreement required no significant services from Crusader.  Further, in essence, the ASC ownership group, by accepting a price reduction of $22 million, had unknowingly and unwittingly funded the $22 million in payments to Burkhart, all of which Burkhart concealed from the ASC ownership group.

b.    2012 Rothner Transactions

199.    In approximately September 2012, HHC entered into another new lease agreement with Eric Rothner that covered 11 Facilities for which Rothner owned the real estate. Again, a put was required as a condition to entering into the transaction, and Burkhart's Crusader entity received substantial upfront sums for agreeing that Crusader would accept a put of the leases and operations should the put option be exercised in the future.  This arrangement was pursuant to a Put Agreement with HHC for the Rothner buildings and another Covenant Support Agreement, this time with Rother.

200.    Crusader and HHC entered into a Put Agreement covering the Rothner Facilities on September 1, 2012.  Pursuant to the agreement, Crusader received $500,000 in an upfront payment.

201.    Crusader and Rothner also entered into a Covenant Support Agreement on September 1, 2012.  Pursuant to this agreement, Rothner agreed to pay Crusader a total of $2,750,000 in installment payments of $275,000 on an annual basis for ten years beginning on September 1, 2012.  The Covenant Support Agreement required no significant services from Crusader, and Crusader did nothing to provide value for these payments.

c.      2013 Omega Transactions

202.     In October 2013, Bill Smith sold the real estate of four Facilities to Omega, and the lease agreement between HHC and Omega was amended to add these Facilities. Burkhart was actively involved in negotiating the sale price on behalf of HHC.  When Bill Smith refused to agree to the proposed sales price, Burkhart offered that ASC would pay him the additional sums he sought by providing Smith with a consulting agreement in which ASC ostensibly agreed to pay Smith approximately $1.2 million (i.e., $25,000 in monthly installments over a four-year period) in return for services which had no value, were never rendered, and were never intended to be rendered.  Burkhart entered into this agreement on behalf of ASC without the knowledge or permission of ASC's owners.  Smith ultimately agreed to Burkhart's proposed terms, and the transaction was closed.  Burkhart's Crusader entity was paid another substantial upfront lump sum payment through another Put Agreement with HHC.  The installment payments to Crusader from Omega also were increased via an Amended Covenant Support Agreement in exchange for Crusader agreeing to accept a possible future put for the additional Bill Smith Facilities if HHC chose to exercise its put option.

203.     Crusader and HHC entered into a Put Agreement covering Smith's Facilities on October 31, 2013.  Per the agreement, Crusader received $400,000 upfront upon the close of the transaction.

204.     Crusader and Omega also entered into an Amended Covenant Support Agreement on October 31, 2013.  Pursuant to the amended agreement, Omega agreed to increase its total installment payments to Crusader to $23.6 million, specifically a payment every six months in the amount of $1,186,644.

d.    2014 Ben Hur Facility Transactions

205.    In the summer of 2014, Dan Houston sold the operations of a Facility called Ben Hur to HHC.  Once again, a put was required as a condition to the acquisition of this Facility, and an ostensible seller to HHC (i.e. Houston) was not satisfied with the sales price offered by HHC. Burkhart agreed to sweeten the deal for Houston by agreeing that ASC would pay him $160,000 pursuant to a consulting agreement (i.e., $10,000 per month for 36 months).  The consulting agreement provided for valueless services that were never intended to be rendered.  Burkhart did not disclose the sham consulting agreement to the ASC owners.  Pursuant to another Put Agreement with HHC, Burkhart, through another Crusader entity, agreed that Crusader would accept a future put for the Facility if HHC chose to exercise its put option.

206.    Crusader and HHC entered into the Put Agreement covering the Ben Hur Facility on August 1, 2014.  Pursuant to the agreement, Crusader received $250,000 upfront upon the close of the transaction and Houston entered into a sham consulting agreement ostensibly with ASC for $160,000 for valueless services.

e.    2015 Formation Transactions

207.    In the summer of 2015, a company called Extendicare sold the real estate of certain Facilities to a healthcare REIT called Formation Capital ("Formation").  HHC leased 17 of the Extendicare Facilities in Indiana from Formation and became the operator for these Facilities. A put was required as a condition to its agreement to lease and operate the Extendicare Facilities. ASC again acted as the manager of these Facilities.  Burkhart (via another Crusader company, JACCD LLC d/b/a Crusader IV) was paid additional upfront payments through a Put Agreement with HHC and a Consulting Agreement with Formation, in exchange for agreeing that Crusader would act as the putee for these Facilities if HHC chose to exercise its put option.

208.    Crusader and HHC entered into a Put Agreement covering Formation's Facilities on July 1, 2015.  Per the agreement, Crusader received $850,000 in an upfront put payment.

209.    Crusader and Formation also entered into a "Consulting Agreement" on July 1, 2015, another method by which Crusader was paid for taking the put.  Per the Consulting Agreement, Formation agreed to pay Crusader $4.1 million in installment payments, namely $525,000 on a quarterly basis beginning on October 1, 2015.

210.    Burkhart and Formation agreed that the payments Formation made to Crusader would be called "consulting payments" rather than covenant support payments to ensure that Formation was not over-paying in taxes, but the purpose of the payments was to compensate Crusader for taking the put.  Burkhart did not inform HHC that the covenant support payments would be referred to as consulting payments in Crusader's agreement with Formation.

f.    Put-Related Losses

211.    As a result of Burkhart's conduct, Burkhart (via the Crusader entities) received at least $4 million dollars from the Put Agreements, over $8 million dollars from the undisclosed Covenant Support Agreements, and was scheduled to receive approximately $22.7 million additional dollars from the Covenant Support and Consulting Agreements.  Thus, acting in concert, Burkhart and his Crusader entities defrauded ASC out of over $34.7 million dollars in upfront put payments, Covenant Support Agreement payments, and consulting fees.

**PREDICATE ACTS ASSOCIATED WITH THE REAL ESTATE TRANSACTIONS**

212.    In relation to the scheme described in paragraphs 187-211 above, Burkhart and the Crusader entities committed the following acts of racketeering, any one of which constitutes a predicate act associated with the fifth category of frauds:

## PREDICATE ACT 57

a.      On or about August 30, 2012, having devised and intended to devise a
scheme to defraud and to obtain money and property by means of false and
fraudulent pretenses, representations, and promises, caused to be delivered
through the United States Mail, to be delivered in accordance with the
directions thereon, an envelope containing a check to Crusader I in the
amount of $2,000,000 in violation of United States Code, Title 18, Section
1341.

## PREDICATE ACT 58

b.      On or about December 20, 2012 having devised and intended to devise a
scheme to defraud and to obtain money and property by means of false and
fraudulent pretenses, representations and promises, caused to be delivered
through the United States Mail, to be delivered in accordance with the
directions thereon, an envelope containing a check to Crusader II in the
amount of $500,000 in violation of United States Code, Title 18, Section
1341.

## PREDICATE ACT 59

c.      On or about July 24, 2014, having devised and intended to devise a scheme
to defraud and to obtain money and property by means of false and
fraudulent pretenses, representations and promises, caused to be delivered
through the United States Mail, to be delivered in accordance with the
directions thereon, an envelope containing a check to Crusader III in the
amount of $250,000 in violation of United States Code, Title 18, Section
1341.

## PREDICATE ACT 60

d.      On or about July 1, 2015 having devised and intended to devise a scheme
to defraud and to obtain money and property by means of false and
fraudulent pretenses, representations and promises, caused to be delivered
through the United States Mail, to be delivered in accordance with the
directions thereon, an envelope containing a check to Crusader IV in the
amount of $850,000 in violation of United States Code, Title 18, Section
1341.

**B.      The Chinese Joint Venture**

213.    Burkhart and Benson fraudulently acquired additional funds that should have gone

to ASC as a result of a joint venture with a Chinese company called CHJ Investments Co., Ltd.

("CHJ").  In December 2013, Burkhart, Benson, and an Indiana businessman who put Burkhart in

touch with the Chinese contacts flew to China to discuss entering into a joint venture to develop nursing homes in China.  Throughout the negotiations, Burkhart falsely represented to CHJ that he was acting on behalf of ASC.  Burkhart also falsely represented to ASC's owners that he was pursing this development opportunity in China on behalf of ASC.

214.    Unbeknownst to ASC's owners, however, Burkhart formed a shell company in January 2014 with a deceptively similar name and initials, "American Senior Care," to receive consulting payments from CHJ, while Burkhart used ASC's resources to provide the consulting services.  All the while, Burkhart falsely represented to ASC's owners that he was pursuing business opportunities with CHJ on behalf of ASC.

215.    After forming American Senior Care, Burkhart signed four separate agreements related to the provision of consulting services to CHJ: (1) a Market Positioning and Design Consulting Service Contract for the Dan Dian Senior Housing/Retirement Community, signed in March 2014; (2) a Memorandum of Understanding on Cooperation, signed in April 2014; (3) a Market Positioning and Design Consulting Service Contract for the Zhu Xinzhuang Senior Housing/Retirement Community; and (4) an Operation Management Consulting Service Contract for Yizhuang Project, signed in November 2014.  On information and belief, Burkhart signed all four contracts on behalf of American Senior Care.

216.    The Market Positioning and Design Consulting Service Contracts and the Operation Management Consulting Service Contract provided for CHJ to wire payments for the consulting services to American Senior Care rather than ASC.  The account into which payments were made was a Fifth Third account number 7655829559, which was not an ASC account.  In total, the contracts called for $684,900 in consulting fees to be paid to American Senior Care, all

of which should have gone to ASC but were fraudulently usurped by the Burkhart/Benson Enterprise.

217.    Burkhart and Benson concealed from ASC's owners that American Senior Care entered into consulting agreements with CHJ and received payments as a result of the venture. Indeed, when ASC's owners asked Burkhart for a status on the business opportunity in China, Burkhart falsely suggested to ASC's owners that the joint venture had not resulted in any earnings. He stated that ASC would not be doing any development work in China but "might" do some consulting work at some point in the future.

218.    In addition to the consulting fees usurped by the Benson/Burkhart Enterprise, ASC suffered additional loss caused by the fraudulent consulting arrangement with CHJ because the Benson/Burkhart Enterprise used substantial ASC resources to carry out the fraud.  Specifically, Burkhart and Benson instructed ten ASC employees to commit substantial time and effort to the project while they were supposed to be contributing that time and effort to ASC.  One ASC employee in particular spent up to 20 hours per week working on the China consulting project. Burkhart also ordered that this employee receive a $20,000 bonus (paid by ASC) for the employee's work on the China project.  Burkhart fraudulently misrepresented to the employee that ASC had already received $250,000 in consulting payments from CHJ when, in reality, ASC had not and would not receive any money due to the Burkhart/Benson Enterprise's fraud.

219.    The Market Positioning and Design Consulting Contract for the Dan Dian Community also provided that the consulting fee paid by CHJ would cover travel costs for "10 person-time trips to Beijing, China."  Nevertheless, as described above, Burkhart and Benson expensed over $140,000 to ASC for travel to China, thereby causing additional loss to ASC.

220. Burkhart's and Benson's fraudulent conduct with respect to the China venture caused the following loss to ASC: (1) $684,900 in lost consulting fees; (2) over $140,000 in fraudulent travel expenses for trips to China; (3) $7,754 in legal fees for services that benefitted American Senior Care at the expense of ASC; (4) a $20,000 bonus paid by ASC to an ASC employee for his work on the venture, and (5) additional loss caused by the devotion of ASC employee resources to a project that did not benefit ASC.

### PREDICATE ACTS ASSOCIATED WITH THE CHINESE JOINT VENTURE

221. In relation to the scheme described in paragraphs 213-220 above, Burkhart, Benson and American Senior Care committed the following acts of racketeering, any one of which constitutes a predicate act associated with the fifth category of frauds:

### PREDICATE ACT 61

a. On or about September 11, 2014, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States wires, to be delivered in accordance with the directions thereon, a wire transaction in the form of a "consulting" fee from CHJ Investments Co., Ltd. to American Senior Care, LLC in the amount of $24,730 in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 62

b. On or about September 11, 2014, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States wires, to be delivered in accordance with the directions thereon, a wire transaction in the form of a "consulting" fee from CHJ Investments Co., Ltd. to American Senior Care, LLC in the amount of $44,046 in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 63

c. On or about September 11, 2014, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States wires, to be delivered in accordance with the directions thereon, a wire transaction in the form of a "consulting" fee from

CHJ Investments Co., Ltd. to American Senior Care, LLC in the amount of $44,047 in violation of United States Code, Title 18, Section 1341.

## VI.   CONCEALMENT

222.   Between 2009 and 2015, in further effort to conceal the vendor overcharges and material misrepresentations from ASC, Burkhart directed certain ASC employees not to share information with ASC's owners directly and to run all communications through him.  Burkhart attempted to create distrust among ASC employees for ASC's owners by falsely stating that he was protecting employee profit sharing funds that ASC's owners were seeking to reduce.

223.   Burkhart also directed certain vendors to communicate only with him about products sold to ASC.

224.   Burkhart further sought to limit any communication between ASC's employees and the Company's owners by asking the owners not to visit the Facilities.  Burkhart also actively prevented ASC's owners from attending meetings with and otherwise interacting with HHC representatives.

225.   Burkhart caused ASC to pay Werner substantial sums of money, without the knowledge or consent of ASC's owners, and in return, Werner utilized his position as CFO to assist Burkhart in concealing the fraudulent schemes through a number of practices, including falsely coding certain expenditures in the Company's books and records to avoid detection, paying without question suspicious and unverified vendor invoices, and misleading HHC's auditors.

226.   Burkhart and Werner further concealed the schemes by utilizing an improper "cookie" accounting practice pursuant to which certain fictitious expenses were recorded in ASC's books and records to create reserves (i.e., "cookies") that could be depleted when large payments were made in furtherance of the schemes.  With reserves in place, Burkhart and Werner knew that

large expenditures would be less likely to be detected by ASC's owners and Executive Directors of the various facilities.

227.     Upon information and belief, to further conceal the fraudulent activity of the Executive Defendants and Vendor Defendants, Burkhart created and used a secret office with sound proof walls, located at 715 West Carmel Drive in Indianapolis.

## PREDICATE ACTS ASSOCIATED WITH CONCEALMENT

228.     In relation to the scheme described in paragraphs 222-227 above, Burkhart, Benson, and Werner committed the following acts of racketeering, which constitute predicate acts associated with the sixth category of frauds:

### PREDICATE ACT 64

a.     On or about July 21, 2011, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States wires, to be delivered in accordance with the directions thereon, an email used to facilitate an improper accounting practice for the purpose of hiding the unapproved and excessive bonuses to the Executive Defendants, in violation of United States Code, Title 18, Section 1341.

### PREDICATE ACT 65

b.     On or about October 21, 2014, having devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, caused to be delivered through the United States wires, to be delivered in accordance with the directions thereon, an email used to facilitate an improper accounting practice for the purpose of hiding the unapproved and excessive bonuses to the Executive Defendants, in violation of United States Code, Title 18, Section 1341.

## CLAIMS FOR RELIEF

### COUNT I.
### Violation of the Racketeer Influence and
### Corrupt Organizations Act, 18 U.S.C. § 1962(c) ("RICO")
### (Against the Executive Defendants)

229.    Plaintiff incorporates by reference paragraphs 1-228 as though fully stated herein.

230.    This claim is brought against the Executive Defendants under 18 U.S.C. § 1962(c) and § 1964(c).

231.    ASC is an "enterprise" as that term is defined in 18 U.S.C. § 1961(4).   This enterprise has its own structure distinct from any violations of RICO described below.

232.    In the alternative, Executive Defendants directed and managed an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4) and *Boyle v. United States*, 556 U.S. 938, 946 (2009).  The association-in-fact enterprise possessed (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose.

233.    The purpose of the association-in-fact enterprise managed and directed by the Executive Defendants was to illicitly take funds, including funds of ASC.

234.    The relationship among the Executive Defendants and the Vendor Defendants constituted a joint enterprise in which each party acted in concert to cultivate, construct, and coordinate an affiliated network of shell companies, co-conspirators, and sham contracts and leases to pursue a common interest – perpetuating a massive, coordinated fraud against ASC.  This effort was directed and operated by the Executive Defendants with assistance from the Vendor Defendants.

235.    The relationship between the Executive Defendants and Vendor Defendants did not involve typical commercial relationships where each entity acts in its individual capacity to pursue

its self-interest.  Instead, the Executive Defendants constructed an enterprise designed solely to defraud ASC and engage in other unlawful conduct, in violation of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).

236.    The Executive Defendants and Vendor Defendants are "persons" as that term is defined in 18 U.S.C. § 1961(3) and were associated with ASC and/or the association-in-fact enterprise directed and managed by the Executive Defendants at all relevant times.

237.    Over the course of several years, the Executive Defendants conducted and managed the conduct of ASC's affairs, or alternatively the affairs of their association-in-fact enterprise, through a continuous pattern of activity that included multiple uses of the United States mails and wires for executing a scheme to defraud ASC along with other unlawful conduct intended to defraud ASC, in violation of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).  These statutory violations constitute a "pattern of racketeering activity" as that phrase is defined in 18 U.S.C. § 1961(1) and used in 18 U.S.C. §1962(c).  This "pattern of racketeering activity" involved multiple predicate acts that occurred within 10 years of one another and involved fraudulent misrepresentations and omissions that were reasonably calculated to deceive.  The predicate acts were related to one another and to the overall goal of defrauding ASC and posed a threat of continued criminal activity.

238.    In furtherance of their scheme, the Executive Defendants routinely used or caused the use of the United States mails and electronic mails.  The Executive Defendants also caused wire transfers of funds to be sent on numerous occasions.  The use of the mails and wires was reasonably foreseeable to the Executive Defendants based on their operation and management of their RICO enterprise.  These acts were continuous and related to one another, as well as to the Executive Defendants' scheme to defraud ASC.

239.    The Executive Defendants acted together in furtherance of their scheme, such agreement reflected in the carefully coordinated and wrongful conduct described in this Complaint.

240.    By reason of the Executive Defendants' predicate acts and/or conduct in violation of 18 U.S.C. § 1962(c), ASC has been injured in its business.  Each predicate act was specifically undertaken in an attempt to injure ASC, each predicate act caused independent injury to ASC's business, and each predicate act was a related part of the Executive Defendants' violation of 18 U.S.C. § 1962.

## COUNT II.
### Conspiracy to Violate RICO, 18 U.S.C. § 1962(d)
### (Against All Defendants)

241.    Plaintiff incorporates by reference paragraphs 1-240 as though fully stated herein.

242.    This claim is brought against all Defendants under 18 U.S.C. § 1962(d).

243.    The Executive Defendants and Vendor Defendants agreed and conspired to the common objective to participate in the affairs of ASC would be carried out through a pattern of two or more racketeering acts committed by some member or members of the conspiracy.  This agreement to participate in the affairs of the enterprise through a pattern of racketeering activity was based on the Executive Defendants' and Vendor Defendants' actual knowledge of the conspiracy and/or of the essential nature and scope of the enterprise, which is reflected by the coordinated activities described in this Complaint, further evidencing that the Executive Defendants and Vendor Defendants knew about and agreed to, and did, participate in operating ASC and/or an association-in-fact enterprise  through a pattern of racketeering activity that harmed ASC in its business.

244.    The Vendor Defendants and Executive Defendants were employed by or associated with ASC or alternatively were employed by or participated in the association-in-fact enterprise constructed and managed by the Executive Defendants, and through the misconduct described in

the Complaint, also knowingly and intentionally conducted or otherwise participated in the activities of the enterprise through a pattern of racketeering activity.

245.     All of the Defendants knowingly agreed (1) to facilitate the operation of ASC and/or the association-in-fact enterprise directed and managed by the Executive Defendants through a pattern of racketeering activity by the Executive Defendants and/or Vendor Defendants, and (2) that some member of the conspiracy would commit at least two predicate acts as defined under the RICO statute, which would result, and did in fact result as intended, in concrete financial harm to ASC's business.   All of the Defendants intended to further an endeavor which, if completed, would satisfy all of the elements of a substantive RICO violation.

246.     It was reasonably foreseeable that the United States mails and wires would be used in furtherance of the Defendants' agreement to operate ASC through a pattern of fraud, and the mails and wires were in fact used in furtherance of the scheme to defraud ASC.   It was also both intended and reasonably foreseeable that ASC would be directly injured in its business.

247.     By reason of all of the Defendants' conduct in violation of 18 U.S.C. § 1962(d), ASC has been injured in its business.

### COUNT III.
### Violation of the Indiana Corrupt Business
### Influence Statute, Ind. Code § 35-45-6-2 ("Indiana RICO")
### (Against All Defendants)

248.     Plaintiff incorporates by reference paragraphs 1-247 as though fully stated herein.

249.     This claim is brought against all the Defendants under Indiana Code § 35-45-6-3. This Court has supplemental jurisdiction to adjudicate this claim, as well as the following state law claims, under 28 U.S.C. § 1367 because each of the state law claims is part of the same case or controversy over which this Court has original jurisdiction.

250.    As described in the Complaint, the Executive Defendants were employed by or associated with ASC or alternatively were employed by or participated in the association-in-fact enterprise constructed, managed and operated by the Executive Defendants, and knowingly or intentionally conducted or otherwise participated in the activities of that enterprise through a "pattern of racketeering activity," as defined in Indiana Code § 35-45-6-1.

251.    The Vendor Defendants were associated with ASC or alternatively were employed by or participated in the association-in-fact enterprise constructed and managed by the Executive Defendants, and, through the misconduct described in the Complaint, also knowingly or intentionally conducted or otherwise participated in the activities of the enterprise through a pattern of racketeering activity.   This "pattern of racketeering activity" included committing a violation of, attempting to commit a violation of, conspiring to commit, or aiding and abetting at least two violations of  Indiana Code § 35-45-9 (criminalizing formal or informal groups with at least three members that specifically promotes, assists in, participates in, or aspires to commit a felony); Indiana Code § 35-43-4-2 (criminalizing knowingly or intentionally exerting unauthorized control over property of another person with intent to deprive the other person of any part of its value or use); Indiana Code § 35-45-15-5 (criminalizing knowingly or intentionally acquiring or maintaining an interest in, receiving, concealing, possessing, transferring, or transporting the proceeds of criminal activity); and possibly other violations specified under Indiana Code § 35-45-6-1.

252.    These incidents of racketeering were performed or agreed to or attempted by the Defendants with the intent to defraud ASC and were not isolated incidents but were instead interrelated by distinguishing characteristics.

253.     By reason of the Defendants' conduct, ASC has been injured in its business and suffered and continues to suffer other actual damages.

## COUNT IV.
### Common-Law Fraud
### (Against All Defendants)

254.     Plaintiff incorporates by reference paragraphs 1-253 as though fully stated herein.

255.     This claim is brought against the Defendants under Indiana common law.

256.     As part of a scheme to defraud ASC, as described in this Complaint, the Defendants knowingly or recklessly made or participated in the making of multiple false and fraudulent statements of material fact and misleadingly failed to disclose multiple material facts to ASC.

257.     The Executive Defendants, with intent to defraud ASC, misrepresented the true price and value of products and services provided to the Facilities, falsely indicating the price/value was higher than it would have been but for the payments to the Burkhart/Benson Enterprise.  The time, place and substance of these misrepresentations, the facts misrepresented, and identification of what was procured by fraud are specifically recounted throughout this Complaint.

258.     The Executive Defendants and Vendor Defendants, with intent to defraud ASC, falsely represented that shell entities owned or controlled by them were legitimate third parties to services agreements involving ASC or that they were performing legitimate services (when in fact they were not) in order to funnel money into those entities on false pretenses and at the expense of ASC.  The time, place and substance of these misrepresentations, the facts misrepresented, and identification of what was procured by fraud are specifically recounted throughout this Complaint.

259.     The Executive Defendants, with intent to defraud ASC, made false accounting entries in ASC's books and records to conceal their fraudulent conduct.  The time, place and substance of these misrepresentations, the facts misrepresented, and identification of what was procured by fraud are specifically recounted throughout this Complaint.

260.    The Executive Defendants, with intent to defraud ASC, made false representations related to expense reimbursement requests as set forth throughout this Complaint.

261.    The Executive Defendants and Vendor Defendants, with intent to defraud ASC, falsely represented the value of the put-related transactions for which his Crusader entities acted as the putee to steal put-related funds that should have gone to ASC.  Burkhart also made false statements to ASC's owners about the joint venture in China to facilitate his theft of the venture's profits from ASC.

262.    The Vendor Defendants, with intent to defraud ASC, submitted numerous invoices to ASC containing misrepresentations of material fact in the form of false statements that services were rendered to ASC when they had not been and/or false statements about the true value of the services.

263.    The Defendants made these false statements and omissions knowing or recklessly ignoring that the statements or omissions were in fact false and knowing or recklessly ignoring that ASC would rely upon those false statements or omissions.

264.    Each of the Defendants agreed or reached an understanding to participate in a scheme to defraud ASC.  Each of the Defendants understood the general objectives of the conspiratorial scheme, accepted them, and agreed, explicitly or implicitly, to do his, her or its part to further those objectives by accomplishing unlawful purposes by lawful means and/or lawful purposes by unlawful means.

265.    ASC reasonably relied to its detriment on the Defendants' statements and omissions and was deceived.

266.    As a direct, foreseeable and proximate result of the Defendants' fraudulent conduct, ASC suffered and continues to suffer actual damages.

## COUNT V.
## Violation of Indiana Deceit Statute, Ind. Code § 35-43-5-3(a)(2)
### (Against All Defendants)

267.    Plaintiff incorporates by reference paragraphs 1-266 as though fully stated herein.

268.    As part of a scheme to defraud ASC, as described in this Complaint, the Defendants knowingly or intentionally made false or misleading written statements with intent to obtain property from ASC.  Ind. Code § 35-43-5-3(a)(2).

269.    The Executive Defendants, with intent to defraud ASC, entered into contracts with third parties for certain services for the Facilities, knowing full well that the services would not in fact be provided and/or the prices for the services were artificially inflated for the benefit of the Defendants.  The time, place and substance of these misrepresentations, the facts misrepresented, and identification of what was procured by fraud are specifically recounted throughout this Complaint.

270.    The Vendor Defendants, with intent to defraud ASC, submitted invoices to ASC containing misrepresentations of material fact that (1) services or products were rendered to ASC when in fact they had not been and/or (2) the value of the services/products was higher than it actually was.  The Vendor Defendants also falsely represented their identities in transactions with ASC to obtain ASC's property under false pretenses.  The time, place and substance of these misrepresentations, the facts misrepresented, and identification of what was procured by fraud are specifically recounted throughout this Complaint.

271.    ASC relied on these false or misleading statements, and as a result, the Defendants did obtain property from ASC.

272.    As a direct, foreseeable and proximate result of the Defendants' fraudulent conduct, ASC suffered and continue to suffer actual damages.

**COUNT VI.**
**Violation of the Indiana Crime Victims Relief Act, Ind. Code § 34-24-3-1**
**(Against All Defendants)**

273.    Plaintiff incorporates by reference paragraphs 1-272 as though fully stated herein.

274.    Based on the conduct described in the preceding Count V (Deceit), ASC has experienced economic loss as a result of the Executive Defendants' and Vendor Defendants' violation of Indiana Code § 35-43.  Under the Indiana Crime Victims Relief Act, ASC is entitled to treble damages, all reasonable costs and reasonable attorney's fees from the Defendants for their statutory violation.  Ind. Code § 34-24-3-1.

**COUNT VII.**
**Breach of Fiduciary Duty**
**(Against Executive Defendants)**

275.    Plaintiff incorporates by reference paragraphs 1-274 as though fully stated herein.

276.    The Executive Defendants owed ASC fiduciary duties of care, including the duty of loyalty, based on the control that they exercised over ASC's operations, their positions in the Company, and the terms of their employment.

277.    As a result of the Executive Defendants' positions and superior knowledge with respect to ASC, the Company reasonably and justifiably placed its trust and confidence in the Executive Defendants.

278.    By engaging in the conduct described in this Complaint, the Executive Defendants breached their duties of care to ASC.  Among other misconduct explained throughout the Complaint, the Executive Defendants breached their fiduciary duties by defrauding ASC, unlawfully depleting ASC's funds, stealing funds that should have gone to ASC, and engaging in improper accounting practices to hide the fraud.

279.    As a direct and proximate result of the Executive Defendants' breach of their fiduciary duties to ASC, ASC suffered and continues to suffer actual damages.

## COUNT VIII.
## Aiding and Abetting Breach of Fiduciary Duty
### (Against Vendor Defendants)

280.    Plaintiff incorporates by reference paragraphs 1-279 as though fully stated herein.

281.    At all times relevant to the allegations in this Complaint, the Executive Defendants were in a fiduciary relationship with ASC by virtue of their roles as officers of the Company and therefore owed ASC fiduciary duties of care, including the duty of loyalty.  The Executive Defendants breached those duties as described elsewhere in this Complaint.

282.    The Vendor Defendants knowingly and substantially assisted in the Executive Defendants' breaches of fiduciary duty by intentionally, actively, and directly assisting the Executive Defendants in creating overcharge schemes, creating a sham contract and false invoices, stealing funds that should have gone to ASC and usurping its corporate opportunities, and conducting other misconduct that harmed ASC, as described in this Complaint.

283.    The Vendor Defendants were aware of the Executive Defendants' duties to ASC and were also aware of their role in the Executive Defendants' breaches of fiduciary duty at the time such conduct occurred.

284.    As a direct and proximate cause of the Vendor Defendants' wrongful conduct, ASC suffered and will continue to suffer actual damages.

## COUNT IX.
## Negligence
### (Against All Defendants)

285.    Plaintiff incorporates by reference paragraphs 1-283 as though fully stated herein.

286.    As described in this Complaint, the Defendants owed ASC a duty of care and failed to exercise ordinary skill and knowledge thereby breaching their duties to ASC.

287.    Throughout the relevant time, each of the Executive Defendants owed ASC a duty of ordinary care, skill and knowledge as would be exercised by a reasonable officer of the

Company. Indeed, the Executive Defendants were obligated to "devote substantially all [their] business time, attention, and energies to the business of [ASC]" and avoid conflicts of interest.

288.    The Executive Defendants' repeated solicitation, acceptance, and facilitation of overcharges at ASC's expense, their creation of shell companies used to defraud ASC, their solicitation and concealment of unreasonably large bonuses and expense reimbursements, as well as the time they spent pursuing their own opportunities at the expense of ASC when they were supposed to be working for ASC were clear violations of their duties of care to ASC.

289.    The Vendor Defendants owed ASC a duty of ordinary skill and knowledge as vendors, which entailed providing the services they agreed to provide, not over-charging for services, and not facilitating the use of sham contracts and invoices.  By engaging in these activities, the Vendor Defendants violated their duty of care to ASC.

290.    As a direct and proximate cause of the Defendants' wrongful conduct, ASC suffered and will continue to suffer actual damages.

**COUNT X.**
**Constructive Fraud**
**(Against All Defendants)**

291.    Plaintiff incorporates by reference paragraphs 1-291 as though fully stated herein.

292.    As described in this Complaint, the Executive Defendants owed ASC a duty of care, including a duty of loyalty, by virtue of serving as officers of the Company.  The Executive Defendants violated that duty by making affirmative, unqualified, deceptive material misrepresentations of past or existing facts or by remaining silent when a duty to speak existed. The Executive Defendants took unconscionable advantage of their dominant position in their fiduciary relationship with ASC.

293.    The Vendor Defendants made affirmative, unqualified statements in order to induce ASC to purchase services, ASC relied on those statements, and the Vendor Defendants professed

to ASC that they had knowledge of the truth of the statements.  Among other misrepresentations, the Defendants, with intent to defraud ASC, falsely represented that shell entities owned by them were legitimate third parties to services agreements involving ASC in order to funnel money into those entities on false pretenses and at the expense of ASC.  ASC was induced to rely on the claimed knowledge of the Vendor Defendants and did rely on their misrepresentations to its detriment because the Vendor Defendants were in a superior position to ASC as sellers.

294.    ASC relied on the Executive Defendants' misrepresentations or silence to their detriment on account of the Executive Defendants' superior position and fiduciary relationship, and were deceived.

295.    As a direct and proximate cause of the Defendants' wrongful conduct, ASC suffered and will continue to suffer actual damages.

### COUNT XI.
### Gross Negligence
### (Against Executive Defendants)

296.    Plaintiff incorporates by reference paragraphs 1-295 as though fully stated herein.

297.    As described in this Complaint, the Executive Defendants had a legal and fiduciary duty to ASC, and they committed a conscious, voluntary act or omission in reckless disregard of their legal duty to ASC and of the consequences to ASC.

298.    The Executive Defendants caused ASC to engage in relationships that benefited themselves at the direct expense of the Company and looted its coffers by directing the Company to provide excessive reimbursements and outsized bonuses to the Executive Defendants.  The Executive Defendants then concealed from ASC the fact that ASC's vendors were undermining Company interests while benefiting the Executive Defendants through excessive payments.  The Executive Defendants also concealed from ASC the fact that they were taking excessive reimbursements, paying outsized bonuses to themselves, and stealing ASC's corporate

opportunities.   These acts and omissions were made in reckless disregard to the Executive

Defendants' legal and fiduciary duties to ASC and of the consequences to ASC.

299.    As a direct and proximate cause of the Executive Defendants' wrongful conduct,

ASC suffered and will continue to suffer actual damages.

## COUNT XII.
### Breach of Contract
### (Against All Defendants)

300.    Plaintiff incorporates by reference paragraphs 1-299 as though fully stated herein.

301.    This claim is brought against all of the Defendants under Indiana law.

302.    Throughout the time relevant to the allegations in this Complaint, the terms of the

Executive Defendants' employment were governed by employment agreements.   Among other

things, the agreements provided that the Executive Defendants would "devote substantially all of

[their] business time, attention, and energies to the business of the Company."   The agreements

further provided that the Executive Defendants were entitled to reimbursement of "reasonable

expenses in performing the services" under the agreement.

303.    As described in this Complaint, the Executive Defendants violated the terms of

their employment agreements by advancing their own interests at the expense of the Company,

looting the Company's coffers, and stealing funds that should have gone to the Company.   They

further violated their agreements by seeking and directing ASC to reimburse wholly unreasonable

expenses unrelated to the operations of ASC.

304.    As a direct and proximate cause of the Executive Defendants' wrongful conduct,

ASC suffered and will continue to suffer actual damages.

305.    Throughout the time relevant to the allegations in this Complaint, the Vendor

Defendants had contracts with ASC to perform services.

306.    As described in this Complaint, the Vendor Defendants violated the terms of their contracts with ASC by charging ASC unreasonably and artificially inflated prices, providing unnecessary services, providing services for which ASC received no benefit, failing to provide ASC the services outlined in the contracts, and otherwise breaching their contracts with ASC.

307.    As a direct and proximate cause of the Vendor Defendants' wrongful conduct, ASC suffered and will continue to suffer actual damages.

**COUNT XIII.**
**Unjust Enrichment**
**(Against All Defendants)**

308.    Plaintiff incorporates by reference paragraphs 1-307 as though fully stated herein.

309.    This claim is brought against all of the Defendants under Indiana law.

310.    As described in this Complaint, the Defendants on numerous occasions directed ASC to pay grossly inflated prices for services, to funnel related, illicit funds to the Defendants, to pay inflated bonuses and excessive expenditures to the Executive Defendants at the expense of the Company, and to provide consulting services for which the Executive Defendants stole the profits. To the extent that the losses ASC suffered as a result of the Defendants' wrongful conduct are not recoverable under a breach of contract claim, the Defendants received a measurable benefit from payments rendered to them at the expense of ASC for sham or inflated services, kickbacks, excessive bonuses and reimbursements.

311.    As a result of the wrongful conduct alleged in the Complaint, ASC has suffered and continue to suffer actual damages, and a measurable benefit has been conferred on the Defendants under such circumstances that the Defendants' retention of the benefit without payment would be unjust.

## COUNT XIV.
## Tortious Interference with Business Relationships
### (Against All Defendants)

312.    Plaintiff incorporates by reference paragraphs 1-312 as though fully stated herein.

313.    ASC has had various business relationships with vendors from which the entities have received legitimate products and services.

314.    The Defendants knew about these relationships and intentionally interfered with these relationships by negotiating, assisting with the negotiation of, fraudulently executing, and conspiring to fraudulently execute agreements that benefitted the Defendants at the expense of ASC.

315.    There was no justification for this interference with ASC's business relationships.

316.    As a direct and proximate cause of the Defendants' wrongful conduct, ASC has suffered and will continue to suffer actual damages.

## COUNT XV.
## Constructive Trust
### (Against All Defendants)

317.    Plaintiff incorporates by reference paragraphs 1-316 as though fully stated herein.

318.    The Defendants have appropriated for themselves funds to which they are not legitimately entitled, and under circumstances that in equity and good conscience, they should not be allowed to keep.

319.    A constructive trust should be entered to convey the fruit of the Defendants' wrongful conduct from those Defendants to ASC because those assets justly belong to ASC, and the Defendants have gained these proceeds through fraud, abuse of their fiduciary or confidential relationships, breach of their duties to ASC, and other illegal conduct.

## COUNT XVI.
### Indemnification
### (Against All Defendants)

320.     Plaintiff incorporates by reference paragraphs 1-320 as though fully stated herein.

321.     This claim is brought against all Defendants under Indiana Law.

322.     As a direct and proximate result of the Defendants' fraud, breaches of duties, and other wrongful conduct described herein, HHC suffered pecuniary loss.

323.     As a result of HHC's loss, ASC was obligated to and expressly agreed to indemnify HHC for those losses.

324.     ASC was not at fault for HHC's loss and its liability to HHC is solely derivative or constructive, and the Executive Defendants have, by their wrongful conduct, caused such derivative or constructive liability to be imposed upon ASC.

325.     ASC has been compelled to pay damages to HHC, all of which was caused by the Defendants, and accordingly, ASC may recover the entire amount of those damages directly from the Defendants under Indiana common law.

## **PRAYER FOR RELIEF**

326.     WHEREFORE, ASC respectfully requests that this Court enter judgment in its favor and against the Defendants as follows:

a.     Awarding damages, together with pre- and post-judgment interest;

b.     Awarding treble damages pursuant to 18 U.S.C. § 1964(c) (RICO), Ind. Code § 34-24-2-6(b) (Indiana RICO), and Ind. Code § 34-24-3-1 (the Crime Victims Relief Act);

c.     Granting attorneys' fees and costs and expenses of this suit pursuant to 18 U.S.C. § 1964(c) (RICO), Ind. Code § 34-24-2-6(b) (Indiana RICO), and Ind. Code § 34-24-3-1 (the Crime Victims Relief Act);

      d.      Imposing a constructive trust over the proceeds of the Defendants' wrongful conduct;

      e.      Awarding exemplary/punitive damages in an amount sufficient to deter such wrongful conduct in the future; and

      f.      Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff, American Senior Communities L.L.C., hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully Submitted,

/s/ Valarie Hays
Ronald S. Safer (*pro hac vice* motion pending)
Matthew C. Crowl (*pro hac vice* motion pending)
Valarie Hays
Kelly M. Warner (*pro hac vice* motion pending)
Laura Kleinman (*pro hac vice* motion pending)
Eli J. Litoff (*pro hac vice* motion pending)
Riley Safer Holmes & Cancila LLP
Three First National Plaza
70 W. Madison, Suite 2900
Chicago, Illinois 60602
312-471-8700
rsafer@rshc-law.com
mcrowl@rshc-law.com
vhays@rshc-law.com
kwarner@rshc-law.com
lkleinman@rshc-law.com
elitoff@rshc-law.com