UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| AMERICAN SENIOR COMMUNITIES, L.L.C., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 1:17-cv-03273-TWP-DML ) |
| JAMES BURKHART, *et al.,* | ) ) |
| Defendants. | ) |
| -------------------------------------------------------- | |
| FIRST FEDERAL SAVINGS BANK, THOMAS MILLS, and ROB NEW, | ) ) ) ) |
| Subpoenaed Parties. | ) |

## Order on Motions to Quash Subpoenas and for Protective Order

Plaintiff American Senior Communities, LLC ("ASC") served documents subpoenas on Rob New, the financial institution (First Federal Savings Bank) with which he has accounts and a banking relationship, and the bank officer (Thomas Mills) at First Federal with whom Mr. New generally interacted for his banking needs.  Mr. New has moved to quash the subpoena served on him, First Federal, and Mr. Mills, and Mr. New has moved for a protective order. First Federal Savings Bank and its employee, Thomas Mills, also have moved to quash their subpoenas and for a protective order.  As explained below, the motions to quash and for protective orders (Dkts. 164 and 166) are GRANTED IN PART AND DENIED IN PART.

The court will first describe the claims in this litigation and the nature of Mr. New's alleged involvement with ASC, and then address the issues raised by the pending motions.

## I.   <u>Background[1]</u>

Plaintiff ASC owns, operates, or manages more than 80 extended care facilities, including assisted and independent senior living communities, and skilled living facilities.  The Health and Hospital Corporation of Marion County ("HHC") holds the health care operating licenses for most of the facilities that ASC manages. As described in its first amended complaint, ASC sued James Burkhart (its former chief executive officer), Daniel Benson (its former chief operating officer), Roger Werner (its former chief financial officer), Gretchen Zoeller (who is or was an owner of a business that provided services or goods to ASC), and various entities in which one or more of these individuals had ownership interests and conducted business with ASC.

ASC contends that the defendants "systematically looted" ASC and defrauded the company of tens of millions of dollars via (a) fraudulent business transactions by which ASC paid inflated prices for goods and services to companies associated with one or more of the defendants, (b) fraudulent kickbacks from vendors, (c) fraudulently inflated salaries, bonuses, and perks, and (d) usurpation of business

---

[1]   The court's description in this Background section is taken from various filings.  These are not findings of fact but provide context to the pending discovery disputes.

opportunities. ASC seeks relief under the federal Racketeer Influenced and Corrupt Organizations Act, Indiana's "little" RICO statute, and a slew of Indiana state law tort, contract, and statutory theories.

Some of ASC's claims have factual predicates that overlap criminal charges brought in 2016 by the United States against James Burkhart, defendant Daniel Benson, and former defendants Joshua Burkhart and Steven Ganote. *See United States v. James Burkhart, et al.*, Case No. 1:16-cr-00212-TWP-TAB. These four men pleaded guilty to conspiracy to commit mail, wire, and health care fraud and (except for Joshua Burkhart) pleaded guilty to money laundering and conspiracy to violate the anti-kickback statute. All were sentenced to prison, with varying sentences; James Burkhart has filed a Section 2255 petition challenging his plea and sentence.

In this civil litigation, ASC dropped its claims against Joshua Burkhart (James's brother) and Steven Ganote and companies affiliated with them when it filed its first amended complaint.

Rob New, the man whose personal and business records are being sought by ASC via its subpoenas to him and his bank, has been involved in senior healthcare-related businesses over many years. He, individually or through entities, has been both a business partner of and a competitor to ASC and Health and Hospital Corporation (the license holder of the facilities managed and operated by ASC). Over time, he and ASC have done millions of dollars of business with each other.

The nature of Mr. New's and his businesses' relationships with ASC or James Burkhart has not been made clear to the court. Mr. New did not describe them at

all or the period over which they existed.  ASC described Mr. New's business relationships via an affidavit of Steven Ganote (Dkt. 185-1), a former defendant in this case who pleaded guilty in the criminal matter to fraud, money laundering, and conspiracy to violate the anti-kickback statute.

Mr. Ganote attests that he worked for Mr. New or his companies from 1996 through 2014, and through his work, learned of the following ways in which Mr. New (or his companies) did business with ASC and Mr. Burkhart.  First, he attests that two companies controlled by Mr. New were "middle-man" vendors to ASC (one providing food and the other providing medical supplies), that retained "administrative" fees from payments made by ASC for the food and medical supplies and then shared those fees with James Burkhart.  Neither of these middle-man companies is named in ASC's amended complaint—as a defendant or otherwise— and for medical supplies, an alleged kickback arrangement described in the amended complaint involves a different middle-man vendor.

Second, Mr. Ganote attests that Mr. New and James Burkhart were partners in one of the "Crusader" entities.  Four Crusader entities are named as defendants in the amended complaint and are alleged to have been used as vehicles that usurped business opportunities belonging to ASC through "put" arrangements.

Third, Mr. Ganote attests that he has observed Mr. New "distributing money to Mr. Burkhart in numerous ways," either through making payments by checks or wire transfers from companies Mr. New controlled, giving Mr. Burkhart "large amounts of cash" or "stacks of casino chips," buying or leasing expensive cars for

Mr. Burkhart and his wife, and buying a Florida condominium for Mr. Burkhart. He also says Mr. Burkhart told him—after his home was searched by the FBI in September 2015 and he and Mr. New then allegedly had met in Florida—that Mr. New was "taking care of him" financially.  While Mr. Ganote's affidavit contains a level of specificity notably absent from Mr. New's description of his business relationships with ASC and Mr. Burkhart, Mr. Ganote's affidavit is silent about when any of the alleged events took place—other than Mr. Burkhart's statement sometime after September 2015 that Mr. New would be "taking care of him."[2]

Whatever the nature of Mr. New's involvement, ASC settled all claims it may have had against him.  Shortly after filing this lawsuit, which did not name Mr. New as a defendant, ASC and Mr. New entered into a Settlement Agreement. ASC released "any and all claims, demands, damages, actions, causes of action, suits, costs (including court costs), expenses, attorneys' fees, judgments, sums of money or claims of any kind or nature whatsoever" against Mr. New and his companies.  The Agreement recites that Mr. New denies all of ASC's allegations against him and any liability to it.[3]

[2]     While Mr. New urges the court not to accept Mr. Ganote's affidavit statements because of the questionable veracity of the affiant, the inclusion of hearsay (Mr. Burkhart's alleged statement to Mr. Ganote), and its "vague" accusations of misconduct, these are not good reasons for rejecting the statements out of hand.  Rather, the court considers ambiguities and lack of specificity in deciding the weight to give Mr. Ganote's affidavit in evaluating proportionality of the discovery sought by ASC.

[3]     Mr. New filed the settlement agreement under seal, but he did not provide a basis for sealing and did not file a motion seeking permission for the agreement to remain under seal, as required by Local Rule 5-11(d)(1)(D). In deciding the motions to quash and for protective order, the court did not review the contents of the

5

Before addressing the scope of discovery sought by the subpoenas, the court addresses Mr. New's threshold argument that no discovery should be had because of the terms of the Settlement Agreement he reached with ASC.

## II.     The Settlement Agreement

Mr. New contends that he bought his peace through the Settlement Agreement and that the wide range and multitude of information ASC now seeks from him and his bank should be foreclosed.  He relies on a Ninth Circuit case, *Dart Industries Co. v. Westwood Chemical Co.,* 649 F.2d 646 (9th Cir. 1980), which affirmed under an abuse of discretion standard a district court's decision that, by the terms of a release agreement, the discovering party had contracted away its ability to seek discovery.  In *Dart,* the release agreement provided that in exchange for $700,000, Westwood "releases and discharges" Dart "of any rights it has or may hereafter have by reason of a conspiracy alleged by Westwood."  The court determined that the release language, while not containing the word "discovery," was sufficiently broad to support the district court's determination that Westwood had given up "everything" against Dart, including the right to seek discovery from it in litigation against former Westwood employees alleged to have been part of the conspiracy with Dart. The court emphasized Dart's status as a nonparty and the "quite strong considerations" for protecting nonparties from the "potential for

---

agreement but accepted the parties' undisputed description of the relevant language in the release provision and the fact that Mr. New denied liability. By separate order and because the settlement agreement itself was not reviewed by the court, the court strikes that document from the record.

harassment and abuse that go with unrestricted discovery." *Id.* at 649 (internal citations and quotations omitted).

This court, in its discretion to manage and control discovery, does not reach the same conclusion as the district court in *Dart* and the Ninth Circuit's affirmance.[4]

First, the language of the ASC/New agreement is not the same as the release language in *Dart.* The ASC/New agreement makes no reference to discovery or to any other term that readily should be interpreted to mean discovery. The court is not persuaded by Mr. New's contention that ASC's release of him from "demands" and "claims" means discovery merely because a subpoena can be described as a claim or a demand.

Second, the concern that intrusive and burdensome "unrestricted" discovery should not be borne by *parties and nonparties* was addressed by the rules of civil

---

[4]     The court also rejects Mr. New's argument that if this court does not reach the same conclusion as the Ninth Circuit in *Dart,* it would require correction from the Seventh Circuit, which would be loath to create a split of authority with the Ninth Circuit. Discovery decisions grounded in a court's exercise of discretion in managing discovery are unlikely to produce true "circuit splits." As the Seventh Circuit has emphasized time and again, a district court has wide discretion with respect to discovery matters, including settling discovery disputes, determining the scope of discovery, and otherwise controlling the manner of discovery. *E.g., Thermal Design, Inc. v. American Soc'y of Heating, Refrigerating and Air-Conditioning Engrs., Inc.,* 755 F.3d 832, 839 (7th Cir. 2014) (court of appeals owes "substantial discretion" to district court's discovery decisions); *Brown-Bey v. United States,* 720 F.2d 467, 470-71 (7th Cir. 1983). The fact that different courts reached different conclusions about discovery matters does not make their decisions incompatible. Moreover, as discussed in the text above, the release language in *Dart* is not even the same as that in the New/ASC agreement, and *Dart* was decided before the rules of civil procedure were serially amended specifically to protect parties and nonparties from "unrestricted" discovery.

procedure after the Ninth Circuit's 1980 *Dart* decision.  As explained by this court in *Noble Roman's, Inc. v. Hattenhauer Distributing Co.,* 314 F.R.D. 304 (S.D. Ind. 2016), Rule 26's expression of the scope and limits of discovery has significantly changed since 1980, and "[e]ach time the language and/or structure of the "Discovery Scope and Limits" section of the rule was changed, it was to rein in popular notions that anything relevant should be produced and to emphasize the judge's role in controlling discovery."  *Id.* at 307.  These revisions occurred in 1983, 1993, 2003, and 2015.  *See id.* at 307-08.  In addition, Rule 45 was substantively amended in 1991 and in later years to protect nonparties.  The Ninth Circuit itself has come to describe *Dart* as a decision grounded in a concern to protect nonparties from burdensome discovery.  *See Douglass v. National Federation of Independent Business,* 1995 WL 579640 at *2 (9th Cir. Oct. 2, 1995) (unpublished) (In *Dart,* "[w]e, with our knowledge of the burdens that litigation can impose on non-parties, decided that Dart should be left at peace").

Thus, while this court does not find that Mr. New's settlement agreement with ASC relieved him of all obligations to provide discovery as a nonparty, the court is vigilant to protect him and the Bank from undue burden and expense.  The fact that ASC entered into a settlement agreement with Mr. New is an appropriate factor in the court's consideration of the burden Mr. New reasonably should bear and, as addressed below, the court agrees that the ASC subpoenas are overbroad and unduly burdensome.

III.   **Governing Discovery Principles**

The scope of discovery available via a Rule 45 subpoena generally is measured by the same standards applicable to party discovery under Rule 26(b)(1). *E.g., Jackson v. Brinker,* 147 F.R.D. 189, 193-94 (S.D. Ind. 1993). Discovery must be proportional to the needs of the case, and the court (and the parties) must balance the need for the discovery against the burden and expense of providing it, under the factors set forth in Fed. R. Civ. P. 26(b)(1).  The court must also consider whether requested information is unreasonably cumulative or can be obtained from another source in a less burdensome way.  *See* Fed. R. Civ. P. 26(b)(2)(C).  Thus, an assertion that discovery is relevant may not be sufficient to require it.

In addition, for nonparty discovery under Rule 45, the court is especially vigilant to protect the nonparty from undue burden and expense.  That theme purposefully runs throughout Rule 45(c) (*see* the Advisory Committee Notes to the 1991 amendments to Rule 45), and the court has broad powers to modify a subpoena, order the payment of attorneys' fees, or order the issuing party to subsidize in whole or in part the expenses a subpoenaed party may incur to comply with the subpoena's demands.  Subsection 45(c)(1) imposes on the court the obligation to police the issuing party's duty not to impose an undue burden; subsection (c)(2) permits the court to order production under terms it deems appropriate that will "protect a person who is neither a party nor a party's officer from significant expense resulting from compliance"; and subsection (c)(3) allows the court to modify or quash a subpoena to prevent undue burden.

9

IV.   **Documents Requested by the Subpoenas**

   **A. The Subpoena to Mr. New**

   The documents subpoena served on Mr. New seeks (1) every communication over at least a 10-year period (from January 1, 2009, to the present) between Mr. New and a list of 19 people and entities that relate in any way to ASC, ASC's owners or any entity owned or controlled by ASC's owners, or HHC; (2) every document and communication over the same period related to any business transaction involving a list of 19 people and entities;[5] (3) all documents, including bank records, relating in any way to money that was paid over the same period by James Burkhart or any family member or agent or entity connected with James Burkhart to Mr. New or any family member or agent or entity connected with Mr. New; and (4) all documents, including bank records, that flow the other direction— documents relating to money paid by Mr. New or associates to James Burkhart or associates over the same 10+-year period.

   **B. The Subpoenas to the Bank**

   The documents subpoenas served on First Federal Savings Bank and its employee, Thomas Mills, are identical to each other.  First Federal represents that any subpoenaed document within Mr. Mills's possession, custody, or control is also

---

[5]   Mr. New contends, and ASC has not rebutted, that he and his companies have had personal and business relationships with some of these 19 people and entities that have nothing to do with James Burkhart or any business Mr. New or his companies had with Mr. Burkhart, persons associated with him, or ASC. Although ASC insists that it is interested only in information related to Mr. Burkhart and ASC, the subpoenas are not so limited in all respects.

in its possession, custody, or control, and therefore the subpoena to Mr. Mills is unnecessarily redundant.  For purposes of discussion, the court will treat both subpoenas as the subpoena to the "Bank."[6]  That subpoena is also broad in scope.

It seeks (1) all documents, including communications, bank statements, and loan-related documents, covering a 10+-year period (from January 1, 2009, to the present), related to James Burkhart, Rob New, and any entity in which either of them had an ownership or financial interest, including eight specifically-identified entities; (2) all communications between Thomas Mills (the bank employee) over the same period and James Burkhart, Daniel Benson, Steven Ganote, Joshua Burkhart, Roger Werner, and Rob New; and (3) all records of any payments, gifts, or other things of value that Mr. Mills was ever paid in his personal capacity by James Burkhart, Daniel Benson, Steven Ganote, Joshua Burkhart, Roger Werner, or Rob New.

The Bank states that it responded to the subpoenas "as it relates to all requests pertaining to parties other than Mr. New and his entities," Dkt. 164 at p. 2, and ASC does not challenge that statement or make any arguments regarding

---

[6]     The court takes at their word the representation by First Federal's and Mr. Mills's counsel that Mr. Mills has no documents other than those the Bank could produce.  Based on that representation, the court assumes counsel has conducted an appropriate inquiry and investigation with Mr. Mills to identify sources of documents (including emails, texts, or other sources Mr. Mills personally keeps) that are responsive and that possibly would not be available if the Bank were to search sources of information within its immediate custody, possession, and control. According to the parties, they have negotiated (or are negotiating) the contents of an affidavit by Mr. Mills to assure ASC that he does not possess information responsive to the subpoena separate from the Bank itself.

the production of information not pertaining to Mr. New and his entities.  The court likewise addresses only enforcement of the Bank subpoena to the extent it pertains to Mr. New and his entities.  If ASC and the Bank have disagreements relating to other matters encompassed by the Bank subpoena and have not resolved them, a separate motion must be brought; the court neither approves or disapproves of ASC's subpoena as to these other matters or the Bank's response.

## V.  <u>Analysis</u>

### A. **ASC's subpoenas are inappropriately indifferent to the burden and expense they foist on nonparties.**

ASC's subpoenas to Mr. New and the Bank reflect an indifference to the imposition of burden and expense that is not consistent with its duties to nonparties under Rule 45, or even consistent with the basic discovery proportionality principle imposed by Rule 26.  ASC's brief opposing Mr. New's and the Bank's motions to quash and for protective orders is similarly indifferent.

ASC asserts that it needs to discover (1) every single communication that Mr. New has had with 19 persons or entities over a 10+-year period that have anything to do with ASC or HHC, (2) every single document over the same period related to every business transaction with these 19 persons or entities, and (3) every document, including bank records, that relate to any money that flowed over 10 years from Mr. New (and affiliates) and James Burkhart (and affiliates), and *vice versa*, because the documents are relevant.  As the court's recitation of the standards governing discovery makes clear, that's not good enough.  Proportionality in general, and the solicitude for nonparties in particular, do not require Mr. New or

the Bank (or the court) to satisfy ASC's desire essentially to audit every transaction

and communication that Mr. New had with anyone ever associated with ASC or

HHC over a ten-year period.

Proportionality requires considering the importance of the information

sought by the subpoenas to issues in the case, the monetary stakes involved, the

extent to which ASC has access to the information from others (including itself),

and whether the burden and expense of providing[7] the information exceeds the

benefit of its production.  ASC eschewed any real discussion of these factors,

asserting instead that because it is seeking information only about matters that

relate to transactions "involving ASC, HHC, and other entities related to ASC's

claims" and wants only to find out about matters that "relate to ASC and James

Burkhart," it is not engaged in a mere fishing expedition.  Its subpoenas are not

actually limited to such matters, however; their scope naturally would include

transactions Mr. New engaged with people and entities that have nothing to do with

ASC.  But even if they were limited to only ASC, HHC, and James Burkhart, except

for the put transactions, there is nothing in ASC's filings to assist the court in

understanding how the information sought by subpoena will lead to the discovery of

---

[7]    The court's reference to "providing" information encompasses the numerous
steps commonly undertaken in conjunction with the actual transfer of documents in
compliance with a subpoena or Rule 34 document request. Sources of information
(physical and electronic sources and custodians) must be identified, search terms
must be devised and searches then carried out, *potentially* responsive documents
must be organized and reviewed for actual responsiveness and for privilege, and
then responsive and non-privileged documents can be produced after appropriate
numbering and identification.

information important to this case or the monetary stakes involved in those

matters.  The put transactions are the business opportunities ASC alleges that

James Burkhart and the four defendant "Crusader" entities, which James Burkhart

and possibly Mr. New owned or controlled, usurped and deprived ASC (or its

owners) of over $30 million dollars.[8]  As to the middle-man vendor transactions

described by Mr. Ganote, those vendors are not even mentioned anywhere in the

amended complaint.

    While discovery in this case generally need not be cabined to only specific

transactions described in the amended complaint, ASC has sources of information

other than Mr. New and the Bank to determine whether other vendors were

---

[8]    The put transactions are described in detail at paragraphs 202-227 of the amended complaint, and Mr. Ganote's affidavit attests that Mr. New was involved in at least one of the Crusader put transactions.  As described in the amended complaint, historically, ASC (or its affiliates) owned the nursing home/assisted living Facilities (the real estate, buildings, fixtures) and leased the Facilities to Health and Hospital Corporation (HHC), which, in turn, entered into a management agreement for ASC to operate and manage the Facilities. These transactions typically contained put provisions, whereby if HHC exited senior living/nursing home business operations before a Facility lease expired, HHC then transferred (or put) its duties and responsibilities under the lease and management agreements to ASC's owners or affiliate and paid the owners/affiliates a fee for having exercised the put.  The amended complaint describes several transactions that occurred between 2012 and 2015, in which the put agreements executed in connection with the acquisition or sale of Facilities that ASC managed or operated were made, not with ASC as the puttee, but with one of the Crusader entities as the puttee.  In these transactions, payments were made to the Crusader entities upfront and over time without regard to whether a put was exercised.  ASC alleges that Mr. Burkhart or the Crusader entities received millions of dollars in payments and that, in one of the transactions in which ASC sold Facilities, ASC accepted a greatly-reduced purchase price (by $22 million) based on false representations Mr. Burkhart made about the put arrangements involved in that transaction (and which allowed Mr. Burkhart and his affiliates to receive the $22 million spread in the form of put-related payments made over time).

involved in kickback arrangements or Mr. Burkhart received other ASC funds that should be made a part of the case.  It can audit its own records.  It can seek information from the defendants or possibly from other vendors.  It may have entered into cooperation agreements with Joshua Burkhart or Mr. Ganote in exchange for dismissing them, and it can obtain their documents and additional information. There is simply no indication that ASC needs the discovery sought by the subpoenas to obtain a reasonably complete picture of the extent of its financial claims against the party-defendants. The fact that information can be obtained from a party is a good reason for prohibiting ASC from requiring a nonparty (particularly one that has settled) to bear the burden and expense—and intrusion of privacy— that the subpoenas to Mr. New and the Bank demand.  *See Morrow v. Air Ride Technologies, Inc.,* 2006 WL 559288 at *2 (S.D. Ind. Mar. 6, 2006) (requiring party to show it could not obtain documents from party adversary before permitting it to burden nonparty to produce the information); Rule 26(b)(2) (court may limit discovery where it is unreasonably cumulative or duplicative or can be obtained from another source with less burden or expense).

ASC also has undervalued Mr. New's privacy interests in his financial records, including bank records.  Citing a 1980 district court decision, *Clayton Brokerage Co. v. Clement,* 87 F.R.D. 569, 571 (D. Md. 1980), it asserts that Mr. New lacks standing to challenge a subpoena to his bank and neither he nor his businesses have any privacy interests in their financial and bank records. The court rejects these assertions.  A person (or entity) has standing to challenge any

15

subpoena affecting his or its "legitimate interests," a term that is broadly

interpreted.  *See Noble Roman's,* 314 F.R.D. at 305-06 (S.D. Ind. 2016) (citing

*United States v. Raineri,* 670 F.2d 702, 712 (7th Cir. 1982)).  And it belies common

sense to suggest that an individual or company has no legitimate interest in the

context of civil litigation to protect the sensitivity of banking records reflecting

personal and company finances and transactions. As this court noted in *Finch v.

City of Indianapolis,* 2011 WL 2516242 at *4 (S.D. Ind. June 23, 2011), "[d]iscovery

aimed at an opponent's personal finances is a quick route to the underside of the

opponent's skin." *See Estate of Lee ex rel. McGarrah v. Lee & Urbahns Co.,* 876

N.E.2d 361, 369 (Ind. Ct. App. 2007):

> It seems self-evident that a person's personal financial records dating
> back five years ... are something almost all persons would prefer to
> keep private.... [A] request for such records would be, for most,
> annoying and quite likely embarrassing, unduly burdensome, and
> expensive as well. We think that rare is the person, even one of clear
> conscience, who would unhesitatingly respond to such a request
> without being compelled, even with assurances of confidentiality.

The fact that a discovery request seeks information that most persons

consider peculiarly private is not of itself a reason to deny discovery outright but is

a reason to require the discovering party to explain clearly the need for that

information—particularly when asked of a nonparty.  *See Pioneer Hi-Bred Internat'l

Inc. v. Holden's Foundation Seeds, Inc.,* 105 F.R.D. 76, 81-82 (N.D. Ind. 1985)

(protecting trade secrets and confidential business information from disclosure

unless the requesting party makes a "clear showing" of their relevance and "specific

need for them to prepare for trial"); Wright & Miller, 8A *Federal Practice &*

*Procedure Civil* § 2043 (3rd ed. 2018) (when discovery is sought of trade secrets or confidential commercial information, the discovering party should be required to show that the discovery has sufficient relevancy and materiality to the case to outweigh whatever harm disclosure would cause).

ASC has not satisfactorily explained why 10+ years of communications and documentation of any financial transactions between Mr. New and Mr. Burkhart or any ASC-affiliated person, including 10 years of bank records, are possibly proportional to the needs of this case. To the extent ASC is seeking information to support collection of an eventual judgment against Mr. Burkhart, such judgment-collection discovery is premature—particularly from a nonparty. Nor is the wide-ranging financial documentation from Mr. New and the Bank proportional discovery vis-à-vis ASC's punitive damages claims against Mr. Burkhart. While a different calculus would be appropriate if the court were considering the scope of financial discovery ASC could obtain from Mr. Burkhart himself—since he has pleaded guilty to fraud, money laundering, and violation of the anti-kickback statute—it is not appropriate to ask Mr. New to lay bare all of his finances for 10 years so that ASC can seek an appropriate amount of punitive damages from Mr. Burkhart. There is no indication ASC cannot obtain information about Mr. Burkhart's wealth from other sources sufficient to permit it to convince a jury to award an appropriate amount of punitive damages.

17

**B. Mr. New's discovery offers were reasonable and the court will limit the subpoenas to his offers.**

Mr. New made proposals to ASC that were reasonable, and the court adopts his proposals contained on page 16 of his reply brief, Dkt. 201, as providing proportional discovery—with two exceptions.  First, the period covered by the searches for responsive information includes documentation through the date of the subpoena (March 5, 2019), and does not end at September 9, 2015, a date described in the complaint and corresponding to the FBI's search of Mr. Burkhart's premises.

Second, the court does not limit production to attorneys' eyes only ("AEO"). AEO designations make litigation much more costly. They require lawyers to interpret the meaning and worth of information without client input; outside, paid expertise may even be required.  Such designations should be avoided wherever possible, and Mr. New's assertion that AEO designations are appropriate because he and ASC are competitors is too generalized to support across-the-board AEO designations. He has not shown how any competitor interests would be jeopardized if the information is shared under the "confidential" designation included in the protective order entered in this case.  *See* Dkt. 68.  Although the court does not absolutely forbid, preemptively, Mr. New from making an AEO designation for particular documents, the court expects the exercise of good faith, professional judgment in the making of designations.  It will not be appropriate to make reflexive AEO designations without considering on a document-by-document basis whether a confidential (or lesser) designation is truly insufficient or whether some other accommodations may ameliorate the need for AEO.  Further, if designations

18

are challenged, the court will hold the designating party to its burden to establish the propriety of the designations, and that burden will require much more than generalities about competitors.  The court also will consider monetary sanctions or other relief if an AEO designation is abused.

Finally, the court does not absolutely foreclose any further discovery from Mr. New or a second subpoena to the Bank to obtain information about Mr. New's or his companies' finances, but it will not permit such additional discovery unless ASC can make a strong showing of its need for additional information from Mr. New or the Bank and its inability to reasonably obtain it elsewhere—something akin to the standard under Rule 26(b)(3) for discovering fact work product.[9]

Mr. New's production in accordance with the following satisfies his obligations under the subpoena to him and to the Bank. The subpoena to Mr. New is therefore MODIFIED as follows.  The subpoenas to the Bank and Mr. Mills are QUASHED.

1. Mr. New will produce responsive, non-privileged documents located in response to the search terms ASC proposed as relevant to the Crusader transactions, for the time period of 2008-3/05/2019.
   ☐ (Burkhart or crusader or jaccd or 105214 or accd or 105210) and put
   ☐ Put w/5 agree*
   ☐ "covenant support"
   ☐ Omega
   ☐ Formation
   ☐ Derwent
   ☐ Battison
   ☐ Dan* w/5 Booth

---

[9]   This is not intended as a second bite at the apple.  The court contemplates only that ASC, after having reasonably exhausted other discovery efforts and review and audit of its own documents, possibly could need other information from Mr. New or the Bank that it could not obtain elsewhere.

   ☐ Dav* w/5 russ
   ☐ Rothner
   ☐ Vantage OR ((Bill OR William) w/5 Smith)

2. Mr. New will produce any other corporate documents relevant to the put transactions/Crusader entities.

3. Mr. New will produce communications with Mr. Burkhart evidencing any payments by Mr. New or his entities to Mr. Burkhart or his entities, using appropriately tailored search terms.  The court expects the parties to cooperate in the selection of these search terms.

4. Based on his records—those reasonably accessible, including Mr. New's and his businesses' bank records that are reasonably accessible to him and do not require undue cost in obtaining them—Mr. New will produce a list of payments from himself, his family, and/or entities he has an ownership interest in, to James Burkhart, Burkhart's family, and/or entities that James Burkhart has an interest in.  The list will identify the payer, payor, date, and amount.  To the extent ASC finds any such payments relevant, Mr. New will produce the underlying document(s) or the relevant portion of the underlying document(s).

The court expects the parties immediately to confer regarding the search terms under paragraph 3, so that the searches for all responsive documents can begin in the next 10 days.  Mr. New immediately should begin preparation of the list described in paragraph 4 so that additional documents under paragraph 4 that ASC reasonably identifies can be produced in a timely manner.  Mr. New may produce documents on a rolling basis, and production should be complete within 30 days.

## VI. <u>Sharing of Costs to Comply with this Discovery Order</u>

Mr. New also requests that the court order ASC to bear the costs he incurs in responding to the subpoena, as modified and ordered above.  His motion and his opening brief did not seek that relief, and ASC did not have a fair opportunity to respond to that request.  The court will therefore not grant that relief.

## VII.  <u>Attorneys' Fees under Rule 26(c)(3)</u>

The prevailing party on a motion for a protective order is entitled to fees unless its opponent's position was substantially justified or other circumstances make an award of fees unjust. *See* Fed. R. Civ. P. 26(c)(3) (incorporating the loser pays provision of Rule 37(a)(5) to rulings on protective orders).  Other than rejecting Mr. New's and the Bank's arguments that the Settlement Agreement foreclosed all discovery, the court has granted in large part the relief sought by the movants. Further, ASC was indifferent in the main to its duty to nonparties under Rule 45. The breadth of its subpoenas and its constant and inaccurate refrain that it reasonably can ask a nonparty to produce anything that is relevant reflect its failure to heed Rule 45(d)(1)'s requirement that it "must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Rule 45(d)(1) requires the court to enforce ASC's duty to avoid imposition of undue burden or expense, including through awarding attorneys' fees.

The court awards to both Mr. New and the Bank their reasonable attorneys' fees incurred in briefing the respective motions to quash and for protective order. Within 14 days of the entry of this order, counsel for Mr. New and counsel for the Bank must make a fee demand on ASC and provide ASC with supporting material to document the time and expense spent on briefing. The parties must thereafter negotiate in good faith reasonable fees and if they are unable to agree, then within 30 days of the entry of this order, Mr. New and the Bank may file petitions for awards of attorneys' fees.

## Conclusion

Mr. New's motion (Dkt. 166) to quash and for protective order and the Bank's and Mr. Mills's motion (Dkt. 164) to quash and for protective order are GRANTED IN PART AND DENIED IN PART as provided in this order.

So ORDERED.

Dated:  January 8, 2020

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record by email through the court's ECF system

DANIEL BENSON #15431-028
MONTGOMERY FEDERAL PRISON CAMP
Inmate Mail/Parcels
MAXWELL AIR FORCE BASE
MONTGOMERY, AL 36112